744 So.2d 212 (1999)
Jerry BULLARD and Joyce Bullard
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 98 CA 1942.
Court of Appeal of Louisiana, First Circuit.
November 5, 1999.
*214 Edward J. Walters, Jr., Keith P. Richards, Baton Rouge, Counsel for Plaintiff/Appellees Jerry Bullard and Joyce Bullard.
Martin E. Golden, Baton Rouge, Counsel for Intervenor/Appellee Prudential Health Care Plans, Inc.
William T. Kleinpeter, Baton Rouge, Counsel for Defendant/Appellant State of Louisiana, Department of Transportation and Development.
Before: GONZALES, FITZSIMMONS, and WEIMER, JJ.
WEIMER, J.
This is a personal injury action stemming from a one-vehicle accident on February 12, 1992. The parties moved to have the issues of liability and damages tried separately. A bench trial on the issue of liability was held on May 27, 1997.[1] In oral reasons dictated into the record, the trial court ruled from the bench immediately after the submission of the case, allocating eighty percent fault to the plaintiff, Jerry Bullard, and twenty percent fault to the State of Louisiana, Department of Transportation and Development (DOTD).[2] After the damages portion of the trial, the court rendered judgment in favor of plaintiffs, Jerry Bullard and Joyce Bullard, and against DOTD, awarding the plaintiffs twenty percent of their damages. The court also rendered judgment in favor of Prudential Health Care Plans, Inc., an intervenor, for twenty percent of its claim for reimbursement of medical expenditures.
Finding that the trial court committed an error of law which tainted the court's evaluation of the evidence, we conduct our review of the record de novo. After review, we conclude DOTD is not liable to the plaintiffs, and we reverse the lower court judgment in favor of plaintiffs and intervenor.

LEGAL ERROR
At the liability phase of the trial, the plaintiffs presented the live testimony of the plaintiff, the police officer who investigated the accident, and an expert in highway design, highway safety, and highway signing. Additionally, the plaintiffs introduced *215 into evidence, in lieu of live testimony, the deposition testimony of Robert Roth and Steve Strength, both of whom are employees of DOTD.
The defense called as a witness Dr. Richard G. Robertson, an expert in traffic engineering, traffic safety, traffic signing, and accident reconstruction. The defense introduced the deposition of Dr. Monroe Samuels, an expert pathologist, and the hospital records from which he testified.
At the conclusion of the liability portion of the trial, the court admitted the deposition of Dr. Samuels and there was a brief colloquy between the court and counsel concerning the contents of the three depositions introduced into evidence. Counsel for the defense informed the court that Dr. Samuels was a pathologist at L.S.U. Medical Center, and that he testified as to the blood alcohol level of Mr. Bullard at the time of the accident and the range of impairment of that level on a driver. The trial judge indicated he had looked at the depositions of the two DOTD employees, but the only fact he extracted from them was that DOTD had no system of maintenance of the signs on the expressway. Implicit in the court's discussion of the depositions entered into evidence by the plaintiffs is the fact that those two depositions were available to the court prior to trial. However, it is clear from the record that the deposition of the defense witness, Dr. Samuels, was not available to the court before the day of trial. Nevertheless, without having read the deposition, the trial court proceeded to render judgment from the bench.
On appeal, counsel for DOTD argues that it was error for the trial court to fail to consider the deposition testimony of DOTD's expert. We agree. When a trial court makes a consequential error in the exclusion of evidence, no weight should be accorded the judgment of the trial court. See McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986). Expert testimony concerning the extent of impairment of a driver who consumed alcohol was certainly germane to the issues in this case. To prove negligence on the part of a person who has admittedly consumed alcoholic beverages prior to operating a vehicle, there must be a showing that the person's mental and physical faculties were materially impaired at the time of the accident. Jones v. Continental Casualty Company of Chicago, Illinois, 246 La. 921, 169 So.2d 50, 52 (1964). There is no statutory presumption of intoxication in civil cases. However, evidence of a blood alcohol reading has probative value and may be considered by the trier of fact in determining if the driver's abilities were impaired. Lemire v. New Orleans Public Service Inc., 538 So.2d 1151, 1154 (La.App. 4 Cir.), writs denied, 542 So.2d 1383, 543 So.2d 2 (1989). Although the evidence was not excluded and the trial court had a brief statement from counsel for defendant regarding the content of the deposition, the defendant was entitled to have the evidence considered prior to judgment being rendered.[3] It is apparent from the record counsel for defendant did not realize his synopsis of the deposition would be the trial court's only exposure to the contents of the deposition. In light of the consequential legal error, we must make an independent review of the record and decide which party should prevail. McLean v. Hunter, 495 So.2d at 1304. Due consideration and appropriate weight will be given to all of the evidence, including the testimony of Dr. Samuels, which the trial court did not appropriately consider.

FACTS
The accident occurred in New Orleans. Mr. Bullard was traveling on the highway referred to as "U.S. Highway 90 Business District" when he reached the Claiborne Avenue exit, which has a posted speed *216 limit of 35 mph. This exit ramp subsequently forks, and Mr. Bullard took the left fork, which is the entrance ramp to U.S. Highway 90 westbound (also known as the Pontchartrain Expressway).
Officer Alwyn Buras, who testified he is employed by the "Crescent City Police Department in New Orleans,"[4] investigated the accident. He testified at trial that he was notified of the accident at 4:56 a.m. When he arrived on the scene just minutes later, no one was in the car, a 1991 Chevrolet Caprice. The car was heavily damaged on the driver's side front and was resting partially upon the top of a four-foot high concrete barrier wall of the ramp.[5] The car, with its lights on, had come to rest at a concrete abutment designed to support a light post. The light post itself was missing.
Mr. Bullard's car initially struck the outside curb in the third and sharpest curve of the ramp in question and continued on the curb for a distance of 47½ feet. The car then made a second impact, which caused it to vault, and the undercarriage went on top of the concrete barrier wall. The car rode atop the barrier wall for another 87½ feet. Thus, the distance between the point where the car first made contact with the curb and the point where the car came to rest at the concrete abutment was approximately 135 feet. The officer testified there were no yaw marks or skid marks showing the driver had reacted to the curve or tried to brake at any time.
Officer Buras testified that it appeared Mr. Bullard was not ejected from the car, but that he safely exited the car and apparently walked on the elevated ramp before falling off the elevated ramp to an area of concrete 35 to 40 feet below. The officer found Mr. Bullard unconscious, and there was an odor of alcohol about him. There was also an odor of alcohol in the car, and the officer found an empty beer can in the car. After his investigation at the scene of the accident, Officer Buras proceeded to Charity Hospital to get a blood test sample from Mr. Bullard. At trial, Officer Buras testified the test showed a blood alcohol level of .12.[6]
The only other lay witness to give live testimony at the trial was the plaintiff, Jerry Bullard. On the date of the accident, he was a sales representative for Daniel Bolt and Gasket, selling oil field products. The day preceding the accident, he made sales calls in Baton Rouge, Louisiana. He made his last call on a customer in Gonzales, Louisiana, at approximately 4:45 p.m. That call lasted until 7:00 or 7:30 p.m., at which time he left Gonzales and traveled to New Orleans. He admitted he drank four or five beers with the customer in Gonzales.
Mr. Bullard recalled arriving in the New Orleans area and going to the La Quinta Inn on the west bank, where he checked in around 10:00 p.m. He then left the La Quinta and went to dinner. At trial, he testified he could not remember where he went to dinner, but he knew he had gone *217 to the east bank. He testified he could not remember what he ate or drank. The last thing he claimed to remember about the time preceding the accident was leaving the restaurant to go back to the motel. On cross examination, he admitted he knew his way back to the motel for he had stayed there before, and he "possibly" could have driven past the accident site before, indicating he had previously visited customers in New Orleans. He testified he had no recollection of what time he left the restaurant or of his whereabouts from the time he left the restaurant until 4:30 a.m., the time of the accident.
James Clary was the plaintiffs' expert witness. Mr. Clary testified that the ramp curves were too sharp and that the ramp was inadequately maintained by DOTD. Mr. Clary testified the ramp consisted of three curves, A, B, and C. He explained that "[y]ou come into a curve that's fairly restrictive but not really, 440 foot radius, into one with 906-1/3 feet which is very easy to negotiate into one that is extremely difficult to negotiate it. It is just kind of going downhill, uphill, around and tightening up into a trap ."
Concerning the allegation of improper maintenance, Mr. Clary testified some chevron signs[7] intended to assist drivers in negotiating the curve were missing. The witness also cited missing light standards as a hazard.[8] However, on cross examination, Mr. Clary admitted the final curve on the ramp as it existed on the date of the accident could be negotiated safely at 20 mph and was safely negotiated many times daily by the vast majority of cars that travel through this area. He also admitted that a car traveling at 20 mph would not vault onto the rail atop the concrete barrier when it hit the curbing.
The plaintiffs deposed Steven C. Strength, a district traffic operations engineer for DOTD. Mr. Strength made an onsite investigation of the ramp in question in preparation for his deposition. He could not testify of personal knowledge of the testing and speed limit changes DOTD made in 1990. However, he provided a department memorandum requesting the 20 mph speed limit sign and the turn sign, and recommending the addition of four chevrons in the third curve.
The deposition testimony of the other DOTD employee, Robert F. Roth, Jr., provided no facts of probative value.
The defense expert, Dr. Robertson, acknowledged that the ramp did not meet the American Association of State Highway and Transportation Officials (AASHTO) recommendations because the compound curve (back to back curves with no straightaway in between) was too tight. Dr. Robertson explained that the use of the geometric configuration that resulted in the tight curve is appropriate only where the engineer is working under some constraint. There was no evidence introduced as to why, at the time the ramp was constructed, it could not be constructed differently so as to comply with the then existing AASHTO recommendations.
The condition created by the compound curve was counteracted in 1990, when DOTD conducted tests on the ramp and lowered the speed limit to 20 mph. The record reveals that after the speed limit on the ramp was lowered, signs and warnings were erected to caution drivers about the sharp curve. Flashing amber lights were attached to the sign which indicated the speed limit was 20 mph. Dr. Robertson testified that the signage, consisting of the *218 20 mph speed advisory, with the flashing caution light, and the right turn arrow,[9] was in place at the time of the accident, and that a driver coming into that location should have known there was going to be an abrupt change in the roadway and should have been actively looking for the change.
It is significant that the plaintiffs introduced evidence of only two other accidents on the ramp. One accident involved a motorcycle, and the other involved a car that went over the wall and fell to the ground. Neither accident is pertinent because both occurred prior to the lowering of the speed limit and the erection of the speed limit signing that was in place on the date of Mr. Bullard's accident.
According to Dr. Robertson, for a car to be able to strike an eight-inch curb and to rise up sufficiently to end up on top of the barrier wall, as the plaintiff's car did, the car would have had to be traveling between a minimum of 41 mph and a maximum of 55 mph. High curbs, such as the one encountered here, will redirect an automobile traveling at 30 mph.
Dr. Robertson testified that a driver driving 40 mph when he reached the speed advisory sign of 20 mph and the right angle turn sign had 300 feet in which to slow down to 20 mph before he reached the accident site curve.[10] This amount of deceleration can be accomplished by the vast majority of drivers, some with and some without braking. When asked whether there was any indication that Mr. Bullard had attempted to steer around the curve, Dr. Robertson answered, "There's no indication of any markings on the roadway of any kind at this location, no indication of braking." He stated that had Mr. Bullard been turning with the curve at the speed necessary for him to vault onto the railing, there would have been yaw or skid marks on the roadway. The absence of such markings indicated to Dr. Robertson that Mr. Bullard either made no attempt to steer or that the amount of steering input was not enough to reach the critical point of exceeding the available friction.
An explanation for Mr. Bullard's deficient driving comes from the evidence that he was intoxicated at the time of the accident, having a blood alcohol concentration of at least .14 percent.[11] Dr. Samuels testified in his deposition that the American Medical Association (AMA) has determined that with a blood alcohol level of merely .05 percent, drivers are "significantly impaired" and unable to operate a vehicle safely. Although Mr. Bullard's blood alcohol level was approximately three times the level identified by the AMA, his impairment was probably greater. Dr. Samuels testified the level of impairment is not a straight numerical increase, but is more like a logarithmic increase. In other words, a person with a.15 percent level as compared to a person with a .05 percent level is much more than three times as impaired, because the increase goes up "more precipitously than just a straight line."
When asked about the effect the alcohol had on Mr. Bullard's ability to drive, Dr. Samuels stated:
It would affect his judgment as to how he operated the vehicle. It would affect his judgment insofar as his ability to negotiate a severe curve would be concerned. It would compromise his ability to judge distances. It would compromise *219 his ability to judge the speed of his own vehicle.
There was no evidence to rebut the testimony of Dr. Samuels.
In summary, the record supports the following scenario of how the accident unfolded. At some time after 4:00 a.m., Mr. Bullard, who had a blood alcohol level of at least .14 percent, got behind the wheel of his Chevrolet Caprice somewhere on the East Bank of New Orleans. He was unable to account for his whereabouts between going out to dinner the night before and the early morning accident. We can assume he had no rest because an empty beer can was found in his vehicle, and the vehicle had a smell of alcohol. Traveling on the Claiborne Avenue exit ramp, which had a posted speed limit of 35 mph, Mr. Bullard took the left fork to enter the Pontchartrain Expressway entrance ramp, traversing curves A and B identified by the plaintiffs' expert. At the area of the fork, the posted speed limit was still 35 mph. Approximately 300 feet before the beginning of curve C, Mr. Bullard passed a large cautionary sign, which posted a 20 mph advisory and which was illuminated with flashing amber lights, and passed a 90-degree angle sign indicating an abrupt change in the roadway. In curve C, Mr. Bullard hit the eight-inch curbing, which failed to redirect his automobile, indicating that he was exceeding 30 mph in a 20 mph zone. There was no evidence of braking or an attempt to redirect the vehicle so as to prevent or lessen the impact. The automobile traveled on the curbing for almost 50 feet, until it made a second impact that caused it to vault on top of the barrier wall. Expert calculations show the vehicle was traveling between 41 and 55 miles per hour for it to be able to make such a vault, a speed between twice and almost three times the posted speed limit. The automobile traveled another 87 feet on top of the barrier wall, until it came to stop when it hit the concrete abutment. Mr. Bullard then safely exited his vehicle and subsequently fell from the ramp to the ground below, a distance of 35 to 40 feet.

DISCUSSION
In order for DOTD to be held liable, the plaintiffs must have proved that: (1) DOTD had custody of the thing which caused plaintiffs' damages, (2) the thing was defective because it had a condition which created an unreasonable risk of harm, (3) DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) the defect was a cause-in-fact of plaintiffs' injuries. Brown v. Louisiana Indemnity Company, 97-1344, p. 3 (La.3/4/98), 707 So.2d 1240, 1242. In determining whether DOTD should be held liable for the design of the ramp or the lack of maintenance, or both, it is appropriate to consider the duty imposed on DOTD.
DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. Id. DOTD has a duty to correct conditions existing on old highways that are unreasonably dangerous, even though it has no duty to bring old highways up to current safety standards unless the highway has undergone major reconstruction. See Cormier v. Comeaux, 98-2378, 1999 WL 451108 *7 (La.7/7/99), ___ So.2d ___, ___.
It is well settled that DOTD is not responsible for every accident which may occur on state highways, nor is it the guarantor of the safety of travelers. Barnes v. Thames, 578 So.2d 1155, 1164 (La.App. 1 Cir.), writs denied, 577 So.2d 1009 (1991). No one can be protected from all risks. Although it would be desirable for DOTD to design roads so that no accidents would ever occur, economic and engineering realities make such a goal unattainable. As indicated, the standard has been expressed as imposing on DOTD a duty to make highways "reasonably safe *220 for persons exercising ordinary care and reasonable prudence." Brown v. Louisiana Indemnity Company, 97-1344 at 3, 707 So.2d at 1242.
This court recently stated that DOTD's duty to provide a reasonably safe roadway may be discharged by providing adequate warnings of a defect or hazard. Phillips v. Alliance Casualty and Reinsurance Company, 95-2161, p. 3 (La.App. 1 Cir. 11/8/96), 689 So.2d 481, 483. Although DOTD has a duty not to create a defect or hazard in the highways, this duty is usually discharged by the giving of adequate warning, which depends on the nature of the hazard to be guarded against. Johnson v. State, Dept. of Transportation and Development, 497 So.2d 768, 771 (La. App. 3 Cir.1986), writ denied, 501 So.2d 231 (1987), citing Von Cannon v. State, Department of Highways, 306 So.2d 437 (La.App. 3 Cir.), writs denied, 309 So.2d 681, 682 (1975). Warnings should be sufficient to alert the ordinary, reasonable motorist, based on considerations of the probable volume of traffic, the character of the road, and the use reasonably to be anticipated. Hardenstein v. Cook Construction, Inc., 96-0829, p. 9 (La.App. 1 Cir. 2/14/97), 691 So.2d 177, 183-184, writ denied, 97-0686 (La.4/25/97), 692 So.2d 1093.
In the instant case, DOTD discharged its duty by taking remedial measures. First, DOTD tested the ramp and recognized that the advisory speed should be lowered. DOTD posted a large sign 300 feet from the beginning of the curve in question advising that the speed limit was 20 mph. Then, DOTD took the extra step of attaching large, flashing amber lights at the sign to alert drivers to the lowered speed limit. Finally, DOTD posted a 90-degree turn sign, the maximum available to warn of the sharp curve ahead.
Thus, we conclude the design of the ramp, although it included a sharp curve, was not unreasonably dangerous because it was properly signed and drivers were properly alerted. To support our conclusion that by taking these remedial measures DOTD discharged the duty it owed to the driving public, or avoided a breach of duty to persons exercising ordinary care and reasonable prudence, we note the testimony of the plaintiffs' own expert witness included an admission that persons driving at 20 mph could negotiate the curve safely.
In addition to urging DOTD was liable because of the design of the curve, the plaintiffs urged the lack of maintenance of the ramp by DOTD contributed to the injuries. Specifically, the plaintiffs maintain DOTD was liable for failure to replace the missing lights and light poles and for failure to provide the chevrons which would have been attached to those poles, which chevrons were recommended by DOTD's engineers.
After carefully evaluating the record, we are convinced that neither the design of the curve nor the failure to provide the chevrons and the lights constituted a cause in fact of the accident. Mr. Bullard was not a driver "exercising ordinary care and reasonable prudence." Brown v. Louisiana Indemnity Company, 97-1344 at 3, 707 So.2d at 1242. He made the disappointing choice to drink excessive amounts of alcohol and drive at an excessive rate of speedviolations of statutes LSA-R.S. 14:98 and LSA-R.S. 32:61 and 64. We are convinced that had he not operated his vehicle at an excessive speed when he was intoxicated and fatigued, the accident would not have occurred.
The actions of the plaintiff driver were grossly negligent, reckless and criminal, and such behavior cannot be excused. A driver has a duty to control his vehicle and maintain a proper lookout. See Andrus v. State, Department of Transportation and Development, 476 So.2d 1077, 1079 (La.App. 3 Cir.1985). The DOTD has a duty to maintain the public highways in a condition that is reasonably safe not only for persons exercising care and reasonable prudence, but also for those who are slightly exceeding the speed limit or who are momentarily inattentive. *221 However, this duty does not extend to protect motorists against harm which would not have occurred but for their grossly negligent operation of a motor vehicle. Soileau v. State Department of Transportation and Development of State of Louisiana, 97-1541, pp. 7-8 (La.App. 3 Cir. 12/9/98), 724 So.2d 834, 839. See also Curry v. Johnson, 590 So.2d 1213, 1219 (La.App. 1 Cir.1991).
Additionally, the record supports the conclusion that Mr. Bullard was out of control when his car first impacted the curb because the absence of yaw marks and skid marks shows he did not attempt to negotiate the curve or apply his brakes to slow down. If Mr. Bullard had observed the 20 mph advisory, his reduced speed would have allowed the curbing to redirect his car as it was designed to do. If Mr. Bullard had observed the 20 mph advisory, his car would not have vaulted onto the barrier wall. As indicated, the plaintiffs' expert witness testified the curve could be negotiated at 20 mph. Mr. Bullard's failure to observe the speed limit for the curve in question made it immaterial whether the chevrons and the lights that should have been in place were, indeed, missing. In the instant case, as in Cormier, a fatigued, intoxicated driver who was speeding lost control of his vehicle. The fact that he was inattentive, asleep, or passed out makes the curve and lack of maintenance irrelevant.

CONCLUSION
Mr. Bullard has our sympathy for his injuries, which are severe, disabling, and unfortunate. However, DOTD is not responsible for these injuries.[12] We reverse the trial court's finding that DOTD was liable for any percentage of the plaintiffs' damages. Thus, we reverse the judgment in favor of plaintiffs and intervenor and we dismiss their petitions with prejudice. We assess plaintiffs with all costs of this appeal.
REVERSED AND RENDERED.
NOTES
[1] At a later date, following the submission of evidence regarding damages, the trial court awarded the plaintiffs the total amount of $4,426,285.33. It is unnecessary for us to discuss this portion of the trial because DOTD did not appeal the issue of damages and because our decision regarding liability disposes of the entire case.
[2] We note that recovery by this plaintiff, whose blood alcohol level was in excess of .10 and who was judged to be more than twenty-five percent at fault, would be barred pursuant to 1999 La. Acts No. 1224, enacting LSA-R.S. 9:2798.4, effective July 9, 1999. As a substantive law, this provision does not apply retroactively and is not applicable to the matter currently before us. See LSA-C.C. art. 6; Rousselle v. Plaquemines Parish School Board, 93-1916, p. 10 (La.2/28/94), 633 So.2d 1235, 1244.
[3] Apparently, even counsel for the plaintiffs did not anticipate the court's ruling from the bench, as counsel inquired about submitting post-trial memoranda.
[4] The officer no doubt meant the "Crescent City Connection police." See LSA-R.S. 48:1101.1.
[5] The barrier wall is a concrete wall on both sides of the ramp which is designed to prevent vehicles from going off the ramp.
[6] This blood alcohol level was calculated using a formula to allow for the lapse of time between the accident and the taking of the blood sample. However, the calculation was not adjusted to account for any fluids administered to Mr. Bullard, as Officer Buras was told that none had been given. Dr. Samuels testified the administration of fluids would have lowered the blood alcohol level present at the time of the accident. Although there is no presumption of intoxication in a civil case, the blood alcohol level has probative value, as previously mentioned. We note that all calculations of Mr. Bullard's blood alcohol level exceed the level necessary in this state for criminal culpability. LSA-R.S. 14:98 provides in part that "operating a vehicle while intoxicated is the operating of any motor vehicle... when ... the operator's blood alcohol concentration is 0.10 percent or more by weight based on grams of alcohol per one hundred cubic centimeters of blood."
[7] The signs referred to contain reflective arrows (chevrons) pointed to the outside of the curve.
[8] The investigating officer testified there are five light standards, but only numbers two and three contained light poles; the other standards had no poles. The warning chevrons were attached to the two light poles in the curve. The lack of lighting made the area dark. The record reveals the light poles and railings on top of the barrier wall were aluminum. At the time of this accident aluminum prices were high and the absence of these items was attributed partially to theft.
[9] Dr. Robertson stated use of the turn sign instead of a curve sign was the "maximum" available signage for a curve of this nature.
[10] It should be noted that a 35 mph speed limit sign was posted at the entrance to the ramp. Dr. Robertson used 40 mph because that speed was indicated in a hypothetical question posed by the judge. Obviously, if one is obeying the speed limit of 35 mph, less distance is needed.
[11] Although the investigating officer testified the blood alcohol level was .12 percent, Dr. Samuels testified it was at least .14 percent, with a minimal dilution of that by fluids administered in the ambulance.
[12] We note our decision would have been the same had we not found legal error and then conducted a de novo review. Even under the manifest error standard of review, the conclusion that Mr. Bullard's conduct was the sole cause of the accident is inescapable. The recent case of Lee v. State, Department of Transportation and Development, 97-0350, p. 7 (La.10/21/97), 701 So.2d 676, 679, is instructive. The Louisiana Supreme Court found the trial court was clearly wrong in holding DOTD thirty percent at fault for failure to post a "stop ahead" warning sign when the sole cause of the accident was the negligence of the driver in making no effort to compensate for decreased visibility caused by glaring sunlight.