BROWN, Chief Judge.
 

 |]The State of Louisiana, Department of Transportation and Development (“DOTD”), appeals from a judgment entered in accordance with a jury verdict finding it to be at fault and 24% liable for damages sustained by consolidated plaintiffs, John Byrd, Eugene Moore, Chris Navarro, Joseph Williams, the Estate of Jamie Starr, and Jerry Starr. Plaintiffs answered, appealing the allocation of 76% of the fault to John Byrd. For the reasons stated herein, we affirm in part and reverse in part.
 

 Facts and Procedural Background
 

 This single automobile accident occurred on September 17, 2004, at approximately 12:09 a.m. John Byrd was driving southbound on Louisiana Highway 851 (hereinafter “Hwy. 851”) in rural Caldwell Parish when his 1996 Dodge Ram pickup truck was unable to negotiate a sharp left curve. The truck left the roadway and struck a number of trees before coming to a rest on its right passenger side and eventually bursting into flames.
 

 Riding with Byrd at the time of the accident were Jamie Starr, Chris Navarro, Joseph Williams, and Eugene Moore. Ms. Starr and Navarro, her flaneé, were riding in the cab of the truck, while Williams and Moore were riding in the bed of the truck. Ms. Starr died at the scene of the accident. Navarro and Williams sustained serious injuries, and Moore suffered a catastrophic brain injury. Byrd reported no injuries at
 
 *133
 
 the scene, but was later treated for superficial facial lacerations at Citizens Rural Clinic in Columbia, Louisiana.
 

 Trooper York, the state trooper investigating the accident, and his training officer, Trooper Cox, arrived at the scene at approximately 1:09 12a.m. Upon their arrival, Trooper York smelled a moderate odor of alcohol about Byrd’s person, so he conducted a field sobriety test. After he performed the test, Trooper York placed Byrd under arrest, handcuffed him, and placed him in his patrol car to await the arrival of Trooper Heard. Trooper Heard arrived at the scene, took custody of Byrd, and transported him to the Caldwell Parish Sheriffs Office for blood alcohol testing, as required by law for all fatality accidents. According to the printout slip of the Intoxilyzer 5000, at 2:45 a.m. Byrd had a blood alcohol content (“BAC”) level of .046g%.
 

 The Estate of Jamie Starr and Jerry Starr filed suit against DOTD alleging,
 
 inter alia,
 
 that the lack of sufficient warning regarding the sharp left-curve on Hwy. 851 was the cause of the accident. At the time of the accident the signage for southbound travelers consisted of a single 90-degree left turn sign. Setting forth nearly the same allegations as Mr. Starr’s petition, Byrd, Moore, Williams, and Navarro filed suit against DOTD shortly thereafter. DOTD answered the suits asserting, primarily, that Byrd’s gross negligence was the cause of the accident. These actions were consolidated for trial.
 

 A jury trial was held between November 2 — November 10, 2009. Thereafter, the jury rendered a verdict assessing 24% liability to DOTD and 76% liability to Byrd, and a judgment in accordance therewith was signed on February 17, 2010. After the signing of the judgment, DOTD filed a motion for new trial and plaintiffs filed a JNOV. After a hearing on these matters, the trial court denied DOTD’s motion for new trial and granted, in Rpart, a JNOV increasing the past wages award to Moore. The amended judgment set total (general + special) damages in the following amounts, which have been reduced to reflect DOTD’s 24% liability: Moore— $2,266,475.92; Navarro — $72,286.89; Byrd — $12,000.00; Williams — $18,618.95; Estate of Ms. Starr — $36,000.00; Mr. Starr — $6,000.00. Additionally, the judgment made the future medical expenses of Moore, which amounted to $1,392,000.00 and are to be paid out of the Future Medical Care Fund,
 
 [1]
 
 subject to a privilege and/or lien for his attorney’s fees.
 

 DOTD now appeals, setting forth seven assignments of error: 1) the trial court erred in failing to grant DOTD’s motion for mistrial; 2) the jury erred in allocating 24% of the liability to DOTD; 3) the trial court erred in allowing Dr. Joseph Citron to testify as an expert in the field of toxicology; 4) the jury erred in awarding damages to Moore for past and future wage benefits; 5) the trial court erred in granting plaintiffs’ JNOV, increasing the amount awarded to Moore in past wages; 6) the trial court erred in ruling that the Future Medical Care Fund could be made subject to a privilege and/or lien for Moore’s attorney’s fees; and 7) the trial court erred in casting DOTD with 100% of the costs of court when it was only cast with 24% of the liability.
 

 Plaintiffs answered the appeal asserting that the jury erred in allocating 76% of the liability to Byrd.
 

 |
 
 ¿Discussion
 

 Assignment of Error No. 1
 

 An inordinate amount of DOTD’s appellate argument is centered on the trial
 
 *134
 
 court’s denial of its motion for mistrial. After a review of the very lengthy and extensive facts and/or allegations set forth in the appellate briefs and in the record, the following are the relevant facts: counsel for DOTD informed the trial court and counsel for plaintiffs that they were going to be calling Ronald Lafferty as a witness; counsel for the Estate of Jamie Starr sent its private investigator to the Laffertys’ residence to interview Mr. Lafferty; due to allegations regarding the possible intimidation and/or stalking of the Laffertys, the trial court sent the Caldwell Parish Sheriff, Sheriff Steven May, to the Laffer-tys’ home to investigate the matter; later that evening Mr. Lafferty had to be checked into the hospital, leaving him unavailable to testify the next day.
 

 On the final day of the trial, DOTD moved for a mistrial on the grounds of interference with a witness and improper communication with a sequestered witness. DOTD alleged during the hearing and on appeal that Mr. Laffertys unavailability was the result of plaintiffs’ investigator’s interference. Further, DOTD contended that Mr. Laffertys testimony was a crucial component to its case since he was the first witness on the scene, and his testimony would have directly impeached the testimony of Byrd regarding his alleged actions in the aftermath of the accident. Thus, DOTD argued, a mistrial was the only remedy that would afford it relief.
 

 |fiThe trial court heard testimony from counsel representing DOTD and plaintiffs, as well as from Sheriff May. Relying on the testimony of Sheriff May, that his investigation led him to believe that the Laf-fertys were not intimidated, and the well-known reluctance of Mr. Lafferty to testify, the trial court ruled that DOTD’s case was not prejudiced by the actions of plaintiffs’ investigator.
 

 We note that DOTD was well aware of Mr. Laffertys fragile mental state, and that the accident at issue and the subsequent, unrelated suicide of his son were the causes of his vulnerable state. Nonetheless, at no point during the six intervening years from the time of the accident until the trial did DOTD depose Mr. Laf-ferty. Had it done so, DOTD could have sought to present the deposition testimony when Mr. Lafferty became unavailable.
 

 Because a mistrial results in the discharge of one jury and the empaneling of another to try the case anew, it is a drastic remedy.
 
 Spencer v. Children’s Hosp.,
 
 432 So.2d 823 (La.1983). Broad discretion is vested in a trial court to grant a mistrial where no other remedy would afford relief, or where circumstances indicate that justice may not be done if the trial continues.
 
 Burks v. McKean,
 
 559 So.2d 921 (La.App. 2d Cir.1990),
 
 writ denied,
 
 566 So.2d 398 (La.1990).
 

 Out of an abundance of caution, the trial court had the intimidation and stalking allegations of DOTD investigated. After holding a hearing in which Sheriff May testified that the Laffertys were not intimidated or threatened by plaintiffs’ investigator, the trial court denied DOTD’s motion |fifor mistrial. We do not find this to be an abuse of the trial court’s broad discretion.
 

 Assignment of Error No. 2
 

 Louisiana law allows a plaintiff to proceed against a public entity, such as the State through DOTD, under a theory of negligence based on La. R.S. 9:2800. Plaintiff must prove that: (1) the thing that caused her damages was in DOTD’s custody; (2) the thing was defective due to a condition that created an unreasonable risk of harm; (3) DOTD possessed actual or constructive notice of the defect, and failed to take corrective measures to remedy the defect within a reasonable period of
 
 *135
 
 time; and (4) the defect was a cause-in-fact of plaintiffs injuries.
 
 Critton v. State, Dept. of Transp. and Development,
 
 43,328 (La.App.2d Cir.06/04/08), 986 So.2d 207,
 
 writ denied,
 
 08-1493 (La.10/03/08), 992 So.2d 1019.
 

 An appellate court can only reverse a factfinder’s determinations when it finds from the record that there is not a reasonable factual basis for the finding, and it further determines that the record establishes that the finding is manifestly erroneous.
 
 Stobart v. State, Dept. of Transp. and Development,
 
 617 So.2d 880 (La.1993).
 

 The issues set forth in this assignment of error are whether the jury erred in failing to find that Byrd was the sole cause-in-fact of the accident, and, alternatively, whether the jury erred in apportioning DOTD with 24% of the fault. In addition, plaintiffs answered asserting that the jury erred in allocating 76% of the fault to Byrd. From the outset, we find that, in the interest of both brevity and simplification, it is important for us to clarify |7what the parties have and have not contested in their briefs. DOTD did not contest its custody of Hwy. 851, Hwy. 851’s defectiveness, or that it had notice thereof; DOTD, however, contends that adequate warning of the defect was in place at the time of the accident, and were it not for the gross negligence on the part of Byrd the accident would not have occurred. Plaintiffs, meanwhile, do not contest the jury’s finding that Byrd was a cause-in-fact of the accident; they merely contend that the proven negligent conduct of DOTD was either equal to or greater than the proven negligent conduct of Byrd.
 

 DOTD’s Liability
 

 DOTD has a general duty to maintain the public highways in a condition that is reasonably safe not only for persons exercising care and reasonable prudence, but also for those who are slightly exceeding the speed limit or who are momentarily inattentive.
 
 Ledbetter v. State, Dept, of Transp. and Development,
 
 502 So.2d 1383 (La.1987). This general duty includes in its scope the more specific duty of providing proper safeguards or adequate warnings of dangerous conditions on the highway.
 
 Stephens v. State, Dept. of Transp. and Development,
 
 440 So.2d 920 (La.App. 2d Cir.1983),
 
 writ denied,
 
 443 So.2d 1119 (La.1984);
 
 Bullard v. State, Dept. of Transp. and Development,
 
 98-1942 (La. App. 1st Cir.11/05/99), 744 So.2d 212,
 
 writ denied,
 
 99-3468 (La.02/11/00), 754 So.2d 939.
 

 The jury in the case
 
 sub judice
 
 found that DOTD was negligent in its signing of Hwy. 851, and that this negligence was a cause-in-fact of the accident.
 

 |sThe initial inquiry to determine if a party may be liable under the duty-risk analysis is cause-in-fact.
 
 Netecke v. State, Dept. of Transp. and Development,
 
 98-1182 (La.10/19/99), 747 So.2d 489. A party’s conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm.
 
 Id.
 
 The act is a cause-in-fact in bringing about the injury when the harm would not have occurred without it.
 
 Lasyone v. Kansas City Southern Railroad,
 
 00-2628 (La.04/03/01), 786 So.2d 682;
 
 Netecke, supra.
 
 While a party’s conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability.
 
 Lasyone, supra; Netecke, supra.
 
 Whether an action is the cause-in-fact of the harm is essentially a factual determination that is usually left for the factfinder.
 
 Boykin v. Louisiana Transit Co.,
 
 96-1932 (La.03/04/98), 707 So.2d 1225.
 

 It is undisputed that on the date of the accident the signage for cars traveling southbound on Hwy. 851 consisted of a yellow and black diamond sign depicting a
 
 *136
 
 90-degree left turn. There was no speed advisory plate attached thereto, nor were there any chevrons in place to warn southbound drivers entering the curve. Both Don Moore and Kelly Adamson, plaintiffs’ and DOTD’s experts in traffic engineering and accident reconstruction, respectively, testified that the speed limit on Hwy. 851 was 55 mph, the comfort speed of the curve at issue was 26 mph, and the critical speed of the curve was 52 mph.
 

 Based upon his examination of Hwy. 851, Don Moore concluded that an adequate signing package would entail, at a minimum, a left turn sign, a 25 mph advisory speed plate, and at least two chevrons for the southbound 19direction. Don Moore stated that this conclusion was based upon, among other things, the curve’s vertical alignment and adverse banking. The vertical alignment, Don Moore testified, would likely have prevented Byrd’s headlights from displaying the pavement, thereby limiting his view of the curve.
 

 DOTD contends that the left turn sign alone was adequate warning of the impending curve. To support this contention DOTD attempts to rely upon the testimony of Don Moore, plaintiffs’ expert. DOTD states in its brief that Don Moore “testified that the turn sign that was in place at the time of the accident indicates to drivers that they should reduce their speed to 30 mph or lower.” This, however, is a misrepresentation of Don Moore’s testimony.
 

 Don Moore testified that a left turn sign, as opposed to a left-curve sign, represents that the approaching curve has a design speed of 30 mph or less. The Manual on Uniform Traffic Control Devices states that a turn sign is intended to be used when the design speed for a curve is 30 mph or less and that speed is equal to or less than the speed limit, and a curve sign may be used when the design speed of the curve is greater than 30 mph and equal to or less than the speed limit. Don Moore further testified that the reason that advisory speed plates have become so important is that most people do not usually make the distinction between the turn sign and the curve sign. Don Moore continued, stating that with regard to the particular curve at issue, an advisory speed plate was necessary to let the unaware motorist [ 10know that there was a fairly radical speed difference between the highway’s speed limit of 55 mph and the 26 mph comfort speed of the curve.
 

 In fact, the testimony of DOTD’s own expert, Kelly Adamson, seems to indicate that the signing package was inadequate. Mr. Adamson testified that “there should have been a twenty-five (25) mile-per-hour placard on this sign, that is a given, we do know that.... There’s not a problem with [the curve], as long as you do warn. And that’s what we’re faced with in this case is, we just didn’t have the twenty-five (25) mile-per-hour sign there at the time of the accident.”
 

 Our review of the record and the testimony of both party’s experts convinces us that there was a reasonable factual basis for the jury to find that DOTD breached its duty to provide adequate warning of the defective curvature of Hwy. 851. This breach, coupled with the negligence of Byrd, was found to be a substantial contributor in bringing about the accident, and we do not find this determination to be manifestly erroneous.
 

 Apportionment of Fault
 

 DOTD further asserts that it should not be held liable to plaintiffs due to Byrd’s impairment, inattentiveness, and excessive speed. Plaintiffs answer conversely, contending that the proven negligent conduct of DOTD equals or outweighs the proven negligent conduct of Byrd.
 

 
 *137
 
 In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (8) the significance of what Inwas sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and, (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
 
 Watson v. State Farm Fire and Casualty Ins. Co.,
 
 469 So.2d 967 (La.1985).
 

 The trier of fact is owed deference in the allocation of fault since the finding of percentages of fault is also a factual determination.
 
 Petre v. State, Dept, of Transp. and Development,
 
 01-0876 (La.04/03/02), 817 So.2d 1107. Absent manifest error, appellate courts can not reverse a factfinder’s allocation of fault.
 
 Id.; Reid v. State, Dept. of Transp. and Development,
 
 25,778, 25,870 (La. App.2d Cir.05/04/94), 637 So.2d 618,
 
 writ denied,
 
 94-1415 (La.09/16/94), 642 So.2d 198.
 

 DOTD contends that the evidence, taken as a whole, clearly shows that Byrd was impaired at the time of the accident. Throughout the initial investigation and the proceeding, DOTD asserted that plaintiffs inconsistently recounted how much they had to drink and when and where they consumed the alcohol. According to Byrd’s testimony at the trial, he had 3 or 4 beers throughout the entire day and night preceding the accident. DOTD, however, submits that the arrest report of Trooper York and the subsequent “DWI Interview” report of Trooper Heard counter Byrd’s testimony. According to both reports Byrd stated that he had consumed approximately a 12-pack of beer prior to the accident.
 

 hJn addition to the inconsistent statements regarding how much Byrd had to drink, DOTD puts forth the opinion of Dr. Michael Hlastala, its expert in physiology and the Intoxilyzer 5000. Dr. Hlastala testified that based upon Byrd’s Intoxilyzer 5000 reading of .046g% BAC, two and one-half hours after the accident, using retrograde extrapolation with an average burn-off rate of .017g% per hour, at the time of the accident he calculated Byrd’s BAC level to be in the range of .07g%— .09g%. Based upon this, Dr. Hlastala concluded that Byrd was in fact impaired at the time of the accident. When cross-examined on the role shock plays in one’s burn-off rate, Dr. Hlastala admitted that if Byrd were suffering from shock in the aftermath of the accident his burn-off rate would have been lower due to a decrease in blood flow to the liver. Dr. Hlastala stipulated, however, that he could not say for sure if Byrd was in shock.
 

 Dr. Joseph Citron, plaintiffs’ expert in toxicology, ophthalmology and the Intoxi-lyzer 5000, stated that he used the industry standard burn-off rate of .015g% per hour to conclude that Byrd had a BAC level of .07g%, with a 20% plus or minus margin of error, at the time of the accident. Dr. Citron testified further that based upon his review of the information submitted to him, Byrd was likely in shock and concussed in the aftermath of the accident. If such were the case, Dr. Citron opined, there is a possibility that Byrd’s BAC level at the time of the accident was as low as the .046g% he registered on the Intoxilyzer 5000. Regardless, in Dr. Citron’s expert opinion, he did not believe
 
 *138
 
 that Byrd was impaired at the time of the accident.
 

 1 ^Intoxication alone is not enough to automatically prevent a plaintiff from recovering for DOTD’s fault. It is merely a factor to consider in Louisiana’s comparative negligence scheme.
 
 Toston v. Pardon,
 
 03-1747 (La.04/23/04), 874 So.2d 791;
 
 Petre, supra.
 
 To prove negligence on the part of a person who has admittedly consumed alcoholic beverages prior to operating a vehicle, there must be a showing that the person’s mental and physical faculties were materially impaired at the time of the accident.
 
 Jones v. Continental Casualty Co. of Chicago, Illinois,
 
 246 La. 921, 169 So.2d 50 (La.1964);
 
 Bullard, supra.
 

 We note the supreme court’s decision in
 
 Petre, supra.
 
 In
 
 Petre,
 
 Ms. Petre was traveling down La. Hwy. 107 with her 10-year-old daughter at an approximate speed of 40-45 mph, when her right tires went off the side of the road. At the time and location of the accident there was a curve warning sign with an attached 40 mph speed advisory plate. Ms. Petre tried to reenter the roadway, but before she was able to she hit a culvert and a driveway, which caused her car to become airborne. As a result of the accident, Ms. Petre suffered serious injuries and, unfortunately, the death of her daughter. Two hours after the accident a blood alcohol test of Ms. Petre yielded a BAC level of ,247g%. The trial court “found that along with the plaintiffs intoxication, the defective curvature and shoulder of the highway as well as the absence of chevrons delineating the curve were all substantial contributors in bringing about the accident....” Fault was equally assessed between Ms. Petre and DOTD. The Third Circuit affirmed the trial court’s decision, finding that there was a reasonable factual basis for the [ utrial court’s holding and that intoxication should not prevent Ms. Petre’s proportionate recovery in light of DOTD’s fault.
 
 [2]
 
 Finding cause for concern in an intoxicated driver recovering from the state, the supreme court granted DOTD’s writ application. Finding that the law does not allow the prohibition of a plaintiff to recover in part from DOTD because of intoxication, the supreme court held that the tidal court’s findings were not manifestly erroneous.
 

 DOTD also asserts that a preponderance of the evidence shows that Byrd was going in excess of 52 miles per hour at the time of the accident, the speed at which Don Moore and Kelly Adamson agreed was the critical speed of the curve. To support this contention DOTD notes the accident report of Trooper York, in which he estimated Byrd’s speed to be 65 mph, and Byrd’s voluntary written statement, which states in pertinent part: “I was driving down the road with my friends ... and was not paying attention to what I was doing. I came upon a curve and was going too fast to take the curve. The truck went off of the road and hit a tree.”
 

 Plaintiffs counter DOTD’s proof of excessive speed by pointing out errors and inconsistencies in Trooper York’s accident report, and his testimony that his estimation of speed was not arrived at by any scientific means. Moreover, plaintiffs contend that Byrd’s statement that “he was going too fast to take the curve,” does not indicate that Byrd was in fact exceeding the speed limit, but rather that at the speed at which he was traveling he was unable to negotiate the curve.
 

 
 *139
 
 | ^Plaintiffs also heavily rely upon the testimony of Don Moore to show that Byrd’s speed was not excessive. Don Moore testified that the curve consisted of five radii, and that Byrd failed to fully negotiate the second to last radius (radius two). According to Don Moore, Byrd successfully navigated approximately 3.5 radii, or 70% of the overall curve. Based upon this, Don Moore calculated Byrd’s speed at the time of the accident to have been “in the speed range somewhere in the forties [40 +/-].” Had Byrd been going 60-65 mph, Don Moore testified, he would have yawed out of control earlier in radius two.
 

 Insofar as DOTD argues that Byrd’s inattentiveness was a cause-in-fact of the accident, it again relies on the accident report of Trooper York and Byrd’s written admission that he “was not paying attention to what I was doing.” Plaintiffs, however, counter this admission with the testimony of Dr. Simoneaux, plaintiffs’ forensic psychologist. Dr. Simoneaux testified that due to Byrd’s emotional state in the aftermath of the accident that took the life of one friend and severely injured the others, Byrd was “manning up” and taking responsibility for the accident. According to Dr. Simoneaux, given the circumstances, “anything [Byrd] would’ve said, would’ve been suspicious with regard to its accuracy ... he was filtering everything through emotions.”
 

 The trier of fact is charged with determining what credibility it assigns to expert witnesses and then deciding which expert among those testifying that it finds more credible.
 
 Mistich v. Volkswagen of Germany, Inc.,
 
 95-0939 (La.01/29/96), 666 So.2d 1073. When findings are based on ^determinations regarding the credibility of witnesses, lay and expert alike, the manifest error standard demands great deference to the trier of fact’s findings.
 
 Lasyone, supra; Rosell v. ESCO,
 
 549 So.2d 840 (La.1989).
 

 In this case there was a multitude of lay and expert witness testimony for the jury to weigh. Whether they found any one witness more or less convincing, however, is outside our purview. The jury completed the jury interrogatories submitted, and with specificity it found that DOTD was negligent in its signing of Hwy. 851. On the other hand, the jury interrogatory regarding Byrd’s negligence broadly stated “Do you find that John Byrd’s negligence was a cause of the accident that occurred on September 17, 2004?”, to which the jury answered in the affirmative. We do not know if the jury’s finding Byrd negligent, and its apportionment of fault therefrom, is based on his alleged impairment, inattentiveness, or excessive speed, or a combination thereof. Nonetheless, based on our review of the record in its entirety, and in consideration of the deference owed the trier of fact in its allocation of fault, we do not find that the jury’s apportionment of fault, 76% to Byrd and 24% to DOTD, was manifestly erroneous. This finding is reasonably supported by the record.
 

 In the dead of the night, plaintiffs, most of whom were underage and had been drinking throughout the day, decided to go for a drive on a dark, rural highway, with multiple curves, and on which Byrd had only previously driven once — it was about a year before and during the day traveling the opposite direction. None of the occupants were wearing seatbelts, and two were riding in the bed of the truck. While there seems to be little Insignificance sought by plaintiffs’ conduct, there was a great deal of a known risk involved. On the other hand, DOTD was or should have been aware of the danger posed by the road, but failed to remedy it with adequate signage. Entering the curve from the northbound direction there was a right
 
 *140
 
 turn warning sign with an attached 25 mph speed advisory plate, and, although the record does not reflect it with 100% certitude, there may also have been a northbound chevron. This makes it apparent that the state, in its superior capacity, was aware of the need for a 25 mph speed advisory plate and chevrons, but failed to install them for southbound drivers. Again, considering these facts and the
 
 Watson, supra,
 
 factors, we do not find that the jury was manifestly erroneous in its allocation of fault.
 

 Assignment of Error No. 3
 

 DOTD next contends that the trial court erred in allowing Dr. Joseph Citron to testify as an expert in the field of toxicology. Dr. Citron was a board certified ophthalmologist with no formal education in the field of toxicology.
 

 If a witness who is qualified as an expert has scientific, technical, or other specialized knowledge which will assist the trier of fact to understand the evidence or to determine a fact at issue, the witness may testify in the form of an opinion or otherwise. La. C.E. art. 702. The trial court has wide discretion to decide whether a particular witness will be allowed to testify as an expert, and its judgment will not be disturbed by an appellate court unless it is manifestly erroneous.
 
 Mistich, supra; Johnson v. English,
 
 34,322 (La. App.2d Cir.12/20/00), 779 So.2d 876.
 

 1 Although Dr. Citron is not board certified in toxicology, he testified to his more than 20 years of studying toxicology through medical education seminars, his numerous publications and presentations on the subject, and his acceptance as an expert in the field in a number of states, including Louisiana. Considering this, and his extensive
 
 curriculum vitae,
 
 we do not find the trial court’s acceptance of Dr. Citron as an expert in the field of toxicology to be manifestly erroneous.
 
 See Sandbom v. BASF Wyandotte, Corp.,
 
 95-0335 (La.App. 1st Cir.04/30/96), 674 So.2d 349.
 

 Assignments of Error Nos. 4 and 5
 

 With these assignments of error, DOTD asserts that the jury erred in awarding Moore past and future earnings, and the trial court erred in granting plaintiffs’ JNOV to increase the amount of the past earnings.
 

 Past Loss of Earnings
 

 It is the plaintiffs burden to prove past lost earnings.
 
 Boyette v. United Services Automobile Assoc.,
 
 00-1918 (La.04/03/01), 783 So.2d 1276. In order to be awarded past lost wages, the plaintiff must prove positively that he would have been earning the wages but for the accident in question.
 
 Id; Hunt v. Board of Sup’rs of Louisiana State Univ. and Agric, and Mechanical College,
 
 522 So.2d 1144 (La.App. 2d Cir.1988).
 

 Awards for past lost wages are not susceptible to the great discretion given the factfinder, because lost income is subject to mathematical calculation.
 
 Davis v. Foremost Dairies,
 
 45,835 (La.App.2d Cir.02/16/11), 58 So.3d 977,
 
 writs denied,
 
 11-0538, 11-0568 (La.04/25/11), 62 So.3d 97;
 
 Bassett v. Toys “R” Us Delaware, Inc.,
 
 36,434 (La.App.2d Cir. p.2/30/02),19 836 So.2d 465,
 
 writ denied,
 
 03-0560 (La.04/25/03), 842 So.2d 408. Although lost earnings need not be precisely proven, they must be shown with reasonable certainty.
 
 Richard v. Wal-Mart Stores, Inc.,
 
 29,926 (La.App.2d Cir.10/31/97), 702 So.2d 79,
 
 writ denied,
 
 97-3002 (La.02/06/98), 709 So.2d 744. Lost earnings can be computed on the amount the plaintiff would in all probability have been earning at the time of trial.
 
 Davis, supra; Bassett, supra.
 

 The jury interrogatories list an award to Moore for “Past Loss of Earn
 
 *141
 
 ings.” The jury originally awarded Moore $42,700. The trial court granted plaintiffs’ JNOV and amended that amount to $146,600. Moore was being compensated for a loss of past wages based upon the flawed premise that he was actually employed as a roofer at the time of the accident.
 

 The evidence shows that Moore dropped out of school after completing the seventh grade. Within the year or two preceding the accident, Moore spent at least two months at a mental health hospital seeking help for anger/depression issues. Moore did not submit a single pay stub or any other evidence reflecting how much, if at all, he had ever been paid for any work. Moore’s lack of proven employment history, especially at the time of the accident, was further revealed during the direct examination of his father, Buddy Moore:
 

 Q: All right. And uh, tell me a little bit about Eugene before we go any further, uh, what did he do uh, on a day-to-day basis, what was his daily activity?
 

 A: Ah, he liked to hunt, fish,
 
 at the time he wasn’t working.
 
 (Emphasis added).
 

 12nThis was a lengthy trial, there were approximately 23 witnesses, examined by counsel for three separate parties, and 60 exhibits admitted into evidence. The jury did its best to absorb all of the information presented. For it to seemingly latch onto the testimony of plaintiffs’ vocational rehabilitation expert, Ashley Bryars, who concluded that Moore was a roofer, is understandable. We note, however, that Ms. Bryars’ assessment was based on information communicated to her that Moore had previously done roofing work and on her review of Moore’s education and family work history; and further, this assessment, and the line of questions it was in response to, clearly pertained more to Moore’s future earning capacity. Ms. Bryars was not presented with actual proof that Moore was employed as a roofer at the time of the accident, and, likewise, no proof of any employment was ever presented at trial. Obviously the jury overlooked the statement of Buddy Moore that at the time of the accident his son was not working. Thus, since there was insufficient proof offered to show that Moore had any employment history, much less that he was actually employed at the time of the accident, he cannot receive lost past wages.
 
 See Hunt, supra.
 

 Accordingly, we find that the jury erred in awarding Moore damages for “Past Loss of Earnings.” Consequently, based upon our finding that Moore was erroneously awarded past wages, discussion of the issue of whether the trial court erred in granting plaintiffs’ JNOV is now moot, and the trial court’s judgment granting such is reversed.
 

 |
 
 ^Future Loss of Earnings/Loss of Earning Capacity
 

 Loss of earning capacity refers to a person’s potential and is not necessarily determined by actual loss.
 
 Quinn v. Wal-Mart Stores, Inc.,
 
 34,280 (La.App.2d Cir.12/06/00), 774 So.2d 1093,
 
 writ denied,
 
 01-0026 (La.03/09/01), 786 So.2d 735. Damages may be assessed for what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity.
 
 Hobgood v. Aucoin,
 
 574 So.2d 344 (La.1990);
 
 Folse v. Fakouri,
 
 371 So.2d 1120 (La.1979). Such damages are calculated on the person’s ability to earn money rather than on what he actually earned before the injury.
 
 Hobgood, supra; Hunt, supra.
 

 Awards for loss of future income are inherently speculative, and are intrinsically insusceptible of being calculated with mathematical certainty.
 
 Lewis v.
 
 
 *142
 

 State Farm Ins. Co.,
 
 41,527 (La.App.2d Cir.12/27/06), 946 So.2d 708. Some of the factors to be considered in determining the amount awarded for loss of future earning capacity include the plaintiffs physical condition before and after his injury, his past work record and the consistency thereof, the amount plaintiff probably would have earned absent the injury complained of, the probability he would have continued to earn wages over the balance of his working life, and discount and inflation rates.
 
 Brandao v. Wal-Mart Stores, Inc.,
 
 35,868 (La.App.2d Cir.12/19/01), 803 So.2d 1039, writ
 
 denied,
 
 02-0493 (La.04/26/02), 814 So.2d 558;
 
 Morgan v. Willis-Knighton Medical Center,
 
 456 So.2d 650 (La.App. 2d Cir.1984).
 

 |mAs previously stated, Ms. Bryars, plaintiffs’ vocational rehabilitation expert, did a thorough assessment of Moore’s future earning capacity. Ms. Bryars conducted an in-home interview with Moore and his family. She assessed not only his educational and personal background, but also the education and work history of his parents and brother. As a result of her review, Ms. Bryars concluded that Moore had the capacity to earn the wages of a roofer. Ms. Bryars researched the available statistical data to determine the average and median wages for a roofer in Louisiana, as well as the national wage averages for white males with and without a high school diploma.
 
 [3]
 
 The average annual wages were $29,340.00, $28,020.00, $36,753.00, and $23,556.00 respectively. Based upon the totality of her research, Ms. Bryars concluded that Moore’s future earning capacity would likely have fallen within the range of the average roofer in Louisiana. Lastly, Ms. Bryars testified that as a result of the accident Moore suffered a complete and permanent loss in his wage earning capacity.
 

 Taking into account the testimony of Ms. Bryars, the testimony of Moore’s physician, Dr. Operario, regarding Moore’s extensive disabilities, and the testimony of Charles Theriot, plaintiffs’ expert economist, about Moore’s work-life expectancy and discount and inflation rates, we find no error in the jury’s award to Moore of $706,680 for his loss of future income.
 

 | ^Assignment of Error No. 6
 

 DOTD contends that the trial court erred in ruling that the future medical expenses of Moore could be subjected to a privilege and/or lien in favor of his attorney for his contingent attorney’s fees. Particularly, DOTD takes issue with the apparent finding of the trial court that the Future Medical Care Fund, in as much as it could limit an attorney’s ability to collect his contracted contingent fee therefrom, is unconstitutional.
 

 La. R.S. 13:5106 B(3)(c) provides:
 

 In any suit for personal injury against the state or a state agency wherein the court pursuant to judgment determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, the court shall order that all medical care and related benefits incurred subsequent to judgment be paid from the Future Medical Care Fund as provided in R.S. 39:1533.2.
 
 Medical care and related benefits shall be paid directly to the provider as they are incurred.
 
 Nothing in this Subparagraph shall be construed to prevent the parties from entering into a settlement or compro
 
 *143
 
 mise at any time whereby medical care and related benefits shall be provided but with the requirement that they shall be paid in accordance with this Subpara-graph. (Emphasis added).
 

 La. R.S. 13:5106 D(l) provides:
 

 “Medical care and related benefits” for the purpose of this Section means all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services, and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services.
 

 La. R.S. 39:1533.2 states:
 

 A. There is hereby established in the state treasury the “Future Medical Care Fund”, hereinafter referred to as the “fund”. The fund shall consist of such monies transferred or appropriated to the fund for the purposes of funding medical care and related benefits that may be incurred subsequent to judgment rendered against the state or a state agency as provided by R.S. 13:5106 and as more specifically provided in R.S. 13:5106(B)(3)(c). All costs or expenses of administration of the fund shall be paid from the fund.
 

 |24B. The fund shall be administered by the treasurer on behalf of the office of risk management for the benefit of
 
 claimants suing for personal injury who are entitled to medical care and related benefits that may be incurred subsequent to judgment. Except for costs or expenses of administration, this fund shall be used only for payment of losses associated with such claims.
 
 At the close of each fiscal year, the treasurer shall transfer to the Future Medical Care Fund from the Self-Insurance Fund an amount equal to the monies expended from the Future Medical Care Fund during that fiscal year. Monies in the fund shall be invested by the state treasurer in the same manner as monies in the state general fund. Interest earned on investment of monies in the fund shall be deposited in and credited to the fund. All unexpended and unencumbered monies in the fund at the end of the fiscal year shall remain in the fund. (Emphasis added).
 

 The trial court, in its ruling to uphold the portion of the judgment which subjected the Future Medical Care Fund to a privilege and/or lien in favor of Moore’s attorney, stated:
 

 My concern is that if I take the, the wordage of the State literally, what we have effectively done is limited Mr. Carroll’s ability to, to get an attorney fee. I don’t see any other mechanism — uh, I don’t see any other way around it. And when we do that, then we have effectively limited a plaintiffs, any plaintiffs ability to seek redress in court under a contingency fee. And to the extent that that limits Mr. Byrd or whomever’s ability to file suit for future medical, I, I just think that the very wordage of the Statutes would be unconstitutional to that extent.
 

 In Isire
 
 v. Meche,
 
 00-1316 (La.10/17/00), 770 So.2d 776, 779, the Louisiana Supreme Court stated:
 

 Generally, a court should not reach the question of a statute’s constitutionality when its unconstitutionality has not been placed at issue by one of the parties to a proceeding. A judge should not declare a statute unconstitutional until the issue of its constitutionality has been presented because a judge’s
 
 sua sponte
 
 declaration of unconstitutionality is a derogation of the strong presumption of constitutionality accorded legislative enactments. While there is no single procedure for assailing the constitutionality of a statute, it has long been held that the unconstitutionality of
 
 *144
 
 a statute must be specially pleaded and the grounds for the claim particularized. This court has articulated this burden as composed of three tiers: “First of all, the plea of unconstitutionality must first be made in the trial court. Next, the plea of unconstitutionality must be specially pleaded. |2sFinally, the grounds outlining the basis of unconstitutionality must be particularized.” These procedural rules exist to afford interested parties sufficient time to brief and prepare arguments defending the constitutionality of the challenged statute. This opportunity to fully brief and argue the issue provides the trial court with thoughtful and complete arguments relative to the issue of constitutionality and furnishes reviewing courts with an adequate record upon which to adjudge the constitutionality of the statute. (Citations omitted).
 

 In the instant case there was no pleading filed concerning the unconstitutionality of any statute. Considering that the constitutionality of no statutes was specially pleaded, the apparent declaration of the trial court regarding the potential unconstitutionality of the Future Medical Care Fund as it relates to the payment, or nonpayment, of an attorney’s contingency fee, was erroneous. Nowhere in the statutes pertaining to the Future Medical Care Fund does it provide for an attorney’s contingency fee to be paid therefrom. Attorney’s fees are not “medical care and related benefits” as provided by the statutes.
 

 Thus, where the language of a statute is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9; La. R.S. 1:4. Accordingly, we find that the clear language of the law does not provide a mechanism by which the Future Medical Care Fund could be subjected to a privilege and/or lien in favor of Moore’s attorney. Therefore, that portion of the trial court’s judgment subjecting Moore’s future medical expenses to a privilege and/or lien in favor of his attorney is hereby vacated.
 

 12(Assignment of Error No. 7
 

 Lastly, DOTD contends that the trial court erred in assessing it with 100% of the costs of court since it was only found to be 24% liable.
 

 La. C.C.P. art. 1920 provides:
 

 Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause. Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
 

 The allocation of court costs among the parties is a matter in which the trial court is afforded broad discretion.
 
 Saunders v. Hollis,
 
 44,490 (La.App.2d Cir.08/19/09), 17 So.3d 482,
 
 writ denied,
 
 09-2221 (La.12/18/09), 23 So.3d 945. While generally the party cast in judgment should be taxed with costs, the trial court may assess costs in any equitable manner and against any party in any proportion it deems equitable, even against the party prevailing on the merits.
 
 Spencer v. Red River Lodging,
 
 37,390 (La.App.2d Cir.02/05/04), 865 So.2d 337. An appellate court may only reverse a trial court’s assessment of costs upon a showing of abuse of discretion.
 
 Saunders, supra; Spencer, supra.
 

 In the instant case, DOTD filed a motion to tax court costs on January 4, 2010. The trial court set the matter for hearing on February 17, 2010; DOTD, however, failed to appear. Whether DOTD’s failure to appear had any bearing on the trial court’s
 
 *145
 
 decision to assess DOTD with 100% of the costs is unknown. Regardless, we do not find that the trial court abused its discretion by allocating 100% of the costs to DOTD. DOTD was the sole defendant, and while there were multiple plaintiffs only Byrd was [ 27apportioned any percentage of the liability.
 
 See Davis v. State, Dept. of Trans, and Development,
 
 94-308 (La.App. 3d Cir.12/07/94), 647 So.2d 552,
 
 writ denied,
 
 95-0034 (La.01/27/95), 649 So.2d 382 (wherein DOTD was found to be 40% at fault, but ordered to pay 100% of the court costs).
 

 Conclusion
 

 For the foregoing reasons, that portion of the judgment entered in accordance with the findings of the jury apportioning fault 76% to plaintiff, John Byrd, and 24% to defendant, the State of Louisiana, Department of Transportation and Development, is affirmed. Further, that portion of the judgment reflecting the jury’s award of future loss of earnings/loss of earning capacity to plaintiff, Eugene Moore, is also affirmed. That portion of the judgment reflecting the jury’s award (and the trial court’s increase via JNOV) to Moore for past lost earnings, however, is reversed. The trial court’s denial of DOTD’s motion for mistrial is affirmed; as is that portion of the judgment taxing DOTD with 100% of the costs of court. Lastly, that portion of the judgment which subjects the Future Medical Care Fund to a privilege and/or lien in favor of Moore’s attorney for his contracted contingency fee is hereby vacated.
 

 APPLICATION FOR REHEARING
 

 Before BROWN, WILLIAMS, GASKINS, MOORE, and LOLLEY, JJ.
 

 Rehearing denied.
 

 [1]
 

 . In accordance with La. R.S. 13:5106 B(3)(c) and La. R.S. 39:1533.2.
 

 [2]
 

 .
 
 Petre v. State, Dept. of Transp. and Development,
 
 00-0545 (La.App. 3d Cir. 12/29/00), 775 So.2d 1252.
 

 [3]
 

 . The statistical data for the median and average wage of a roofer in Louisiana was obtained from the May 2006
 
 Statewide Occupational Employment Survey Statistics: Louisiana.
 
 The statistical data for the national wage averages of a white male with and without a high school diploma was obtained from
 
 The 2008 Statistical Abstract.