DRAKE, J.
| ¡.The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (“LSU Board”) appeals a judgment on a jury verdict that awarded damages to the plaintiff for injuries she sustained in an indoor rock wall climbing accident. For the following reasons, we reverse and amend portions of the judgment and affirm as amended.

FACTS AND PROCEDURAL HISTORY

It is undisputed that on the evening of December 3, 2008, Brandy Lynn Fecke sustained injuries when she fell from a bouldering wall located at the LSU Recreation Center (“LSU UREC”) indoor rock climbing wall facility. Ms. Fecke, then a 23-three-year-old senior at LSU, and a fellow classmate, Chad Culotta, visited the indoor rock climbing facility to complete a required assignment for an Outdoor Living Skills Activity course. The indoor rock climbing facility at the LSU UREC is housed in a remodeled racquetball court. LSU converted the court into the rock climbing wall facility, with three rock wall climbing options: (i) a 19' climbing wall; (ii) a 13' 1" bouldering wall located on the rear wall; (iii) and a 13' 1" bouldering wall located on a side wall.
After Ms. Fecke and Mr. Culotta paid for admission to enter the indoor rock climbing wall facility and received a receipt, the LSU UREC employees working the night of the accident signed Ms. Fecke and Mr. Culotta’s course forms to verify their completion of the rock wall climbing assignment for their Outdoor Living Skills Activity course. Ms. Fecke also executed a Rock Climbing Wall Participation Agreement, which was provided to her by the LSU UREC employees. The student workers inquired into their previous experience with rock climbing. Ms. Fecke testified that she climbed a rock wall twice before — once when she was eight years old and a second time when she was ten years old. Ms. Fecke also testified that she had “top lined” previously, that is, that she knew about |sclimbing a wall wearing a harness and using safety ropes, i.&, belay *333 ropes. The employees proceeded to go through the instructions for the rock wall climbing experience. They explained to Ms. Fecke and her classmate that they could climb the 19' climbing wall with top ropes while wearing a harness, or they could climb one of the 13' 1" bouldering walls. Ms. Fecke wanted to climb the “easiest wall” and opted to climb the rear bouldering wall, which did not require her to wear a harness or climb with belay ropes. Bouldering is when a climber, with a partner standing behind the climber to act as a spotter in case the climber needs assistance, climbs up to a certain point on the wall and then traverses the wall side-to-side, in order to develop proficiency in climbing.
After instruction and a climbing demonstration by one of the employees, Ms. Fecke’s classmate climbed up and then traversed down the wall. Ms. Fecke then climbed the wall. After reaching the top of the wall, Ms. Fecke began her descent; however, she got stuck while traversing down the wall and was unable to climb down any further. She lost her footing and hung from the wall. When she lost her grip after hanging for a few seconds, she let go of the wall and pushed herself away from the wall. As she fell, Ms. Fecke twirled around, facing away from the wall. Ms. Fecke landed on her left foot and sustained multiple fractures to the talus bone in her left ankle, known as a comminuted talus fracture. Due to the severity of the fractures, Ms. Fecke underwent three surgeries and will require additional surgery, including either a permanent ankle fusion or an ankle replacement.
Ms. Fecke and her parents, Stephen and Karen Fecke, brought suit against the LSU Board for damages Ms. Fecke sustained as a result of the accident. Following a three-day jury trial, the jury returned a verdict in favor of Ms. Fecke, Karen Fecke, and Stephen Fecke and against the LSU Board, and awarded damages. The jury allocated 75% of the fault to the LSU Board and 25% of the fault to Ms. Fecke and awarded damages to Ms. Fecke as follows:
$150,000.00 ^Physical Pain and Suffering, Past and Future:
$125,000.00 Mental Pain and Suffering, Past and Future:
$75,000.00 Loss of Enjoyment of Life:
$165,000.00 Permanent Disability and Scarring:
$60,392.72 Past Medical Expenses:
$1,000,000.00 Fecke Future Medical Expenses:
$350,000.00 Loss of Future Earnings:
$1,925,392.72 TOTAL:
Additionally, the jury awarded damages to Karen Fecke as follows:
Loss of Consortium and Society: $50,000.00
The jury awarded no damages to Stephen Fecke for loss of consortium and society.
Six months later, the trial court signed a judgment on October 3, 2014, and after adjusting the jury’s damage award based on the fault allocation, awarded damages to Ms. Fecke as follows:
*334 Physical Pain and Suffering, Past and Future: $112,500.00
Mental Pain and Suffering, Past and Future: $93,750.00
Loss of Enjoyment of Life: $56,250.00
Permanent Disability and Scarring: $123,750.00
Past Medical Expenses: $45,294.54
Fecke Future Medical Expenses: $750,000.00
Loss of Future Earnings: $262,500.00
TOTAL: $1,444,044.54
|fiThe trial court also awarded Ms. Fecke all costs of the proceedings plus 6.0% judicial interest from the date of judicial demand until paid, pursuant to La. R.S. 13:5112(0). Furthermore, the trial court ordered that after being reduced for attorney’s fees and costs, Ms. Fecke’s future medical care award of $750,000 (plus judicial interest) be placed in a reversionary trust in accordance with La. R.S. 13:5106(B)(3)(c).[1] Additionally, the trial court awarded damages to Karen Fecke as follows:
Loss of Consortium and Society: $37,500.00
The trial court also awarded Karen Fecke all costs of the proceedings plus 6.0% judicial interest from the date of judicial demand until paid, pursuant to La. R.S. 13:5112(C). Finally, the trial court cast the LSU Board with all costs of court, including but not limited to, the expert witness fees as follows:
Dan Pervorse: $3,500.00.
Dr. James Lalonde: $1,400.00
Dr. John F. Loupe: $900.00
Stephanie Chalfin: $1,500.00
Harold Asher: ■ $3,000.00
The LSU Board now appeals the October 3, 2014 final judgment of the trial court, assigning three errors to the trial court’s application of the law pertinent to this case.

LAW AND DISCUSSION

Standard, of Review

The appellate court’s review of factual findings is governed by the manifest error/clearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court; and 2) whether the record ■ further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the factfinder’s finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a fact-finder’s factual finding only if, after reviewing the record in its entirety, it determines the finding was clearly wrong. See Stobart v. State, through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993).
*335 A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.. When such a prejudicial error of law skews the trial court’s finding as to issues of material fact, the | (¡appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735. However, the above approach need not be considered when a jury has made some factual findings favorable to each party, and when, the legal error affected only one of the findings, but does not interdict the entire fact-finding process. The appellate court should proceed to evaluate each jury finding pertinent to liability in order to determine the applicability of the manifest error rule to each. If only one of the jury’s factual findings is tainted by the application of incorrect principles of law that are prejudicial, the appellate court's de novo review is limited to the jury finding so affeeted. Rideau v. State Farm Mut. Auto. Ins. Co., 06-0894 (La.App. 1 Cir. 8/29/07), 970 So.2d 564, 571, writ denied, 07-2228 (La.1/11/08), 972 So.2d 1168.

Assignment of Error 1:

! In the first assignment of error, the LSU Board contends the trial court erred by ordering that attorney’s fees and costs were payable out of Ms. Fecke’s damage award for her future medical care. The LSU Board further contends that the trial court erred by awarding Ms. Fecke interest on that award. Ms. Fecke counters that she is entitled by statute to receive interest on her futui-e medical care damage award, and she further argues that the trial court is authorized by statute to award contractual attorney fees ’from that award prior to establishing the terms and provisions of a reversionary trust, which is to be. created for her future medical care expenses. Thus, the first issue before this court is whether any interest, attorneys fees, or costs are1 due and collectible by. Ms. Fecke and her attorneys on and out of her damage award against LSU for future medical care. As the facts in this matter are not in dispute and the issue on this assignment of error is purely one of the statutory interpretation of La. R.S. 13:5106, a section of the Louisiana ^^Governmental Claims Act, this - court will review the-matter de novo, without deference to the legal conclusion of the trial court, and determine whether the error was prejudicial to the case. Turner v. Willis Knighton Med. Ctr., 12-0703 (La.12/4/12), 108 So.3d 60, 62; Duzon v. Stallworth, 01-1187 (La.App. 1 Cir. 12/11/02), 866 So.2d 837, 861, writ denied sub nom,, Duzon ex rel. Cmty. of Acquets & Gains v. Stallworth, 03-0589 (La.5/2/03), 842 So.2d 1101, and writ denied, 03-0605 (La.5/2/03), 842 So.2d 1110.
Suits against the State of Louisiana, a state agency, or a political subdivision must be brought pursuant to the Louisiana Governmental Claims Act, La. R.S. 13:5101-5113 (“Act”). The Act applies to any suit in contract or for injury to person or property. La. R.S. 13:5101(B)(1). Pursuant to the Act, the Legislature appropriates certain' funds to pay claims against the State, its agencies, and political subdivisions. La. R.S. 13:5106(B)(1). ■ The Act caps a claimant’s damages for personal injury at $500,000.00, exclusive of property damage; medical care and related benefits, loss of earnings, and loss of future earnings. La. R.S. 13:5106(B)(1).
When a trial court determines that a plaintiff.in a suit for personal injury against the state or a state agency is *336 entitled to medical care and related benefits[2] incurred subsequent to judgment, ie. future medicals, the provisions of the Future Medical Care Fund (“FMCF”), La. R.S. 39:1533.2, apply to such cases. Louisiana Revised Statutes 13:5106(B)(3)(c) is the controlling statutory authority for personal injury claims against the state or a state agency:
In any suit for personal injury against the state or a state agency wherein the court pursuant to judgment determines that the claimant is entitled to medical care and related benefits that may be incurred | ^subsequent to judgment, the court shall order- that all medical care and related benefits incurred subsequent to judgment be paid from the Future Medical Care Fund as provided in R.S. 39:1533.2. Medical care and related benefits shall be paid directly to the provider as they are incurred. Nothing in this Subparagraph shall be construed to prevent the parties from entering into a settlement or compromise at any time whereby medical care and related benefits shall be provided but with the requirement that they shall be paid in accordance with this Subpara-graph. [Emphasis added.]
The FMCF is administered by the Office of Risk Management, through the Treasurer of the State of Louisiana. La. R.S. 39:1533.2(B).
In contrast, when a trial court determines that a plaintiff in a suit for personal injury against a political subdivision is entitled to medical care and related benefits incurred subsequent to judgment, a reversionary trust is established for the benefit of the plaintiff and all future medical care is paid pursuant to the reversion-ary trust instrument. Louisiana Revised Statutes 13:5106(B)(3)(a)[3] is the controlling statutory authority for personal injury claims against political subdivisions:
In any suit for personal injury against a political subdivision wherein the court, pursuant to judgment, determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, the court shall order that a reversionary trust be established for the benefit of the claimant and that all medical care and related benefits incurred subsequent to judgment be paid pursuant to the reversionary trust instrument. The reversionary trust instrument shall provide that such medical care and related benefits be paid directly to the provider as they are incurred. Nothing in this Paragraph shall be construed to prevent the parties from entering into a settlement or compromise at any time whereby medical care and related benefits shall be provided, but with the requirement of establishing a reversionary trust. [Emphasis added.]
The Act does not limit the rights of a claimant to contract with respect to attorney’s fees and costs when the claimant’s future medical care is paid from a rever-sionary |ntrust established by a political *337 subdivision for that claimant’s future medical care. As provided for in Louisiana Revised Statutes 13:5106(D)(3):
“Reversionary trust” means a trust established by a political subdivision for the exclusive benefit of the claimant to pay the medical care and related benefits as they accrue, including without limitation reasonable and necessary amounts for ah diagnosis, cure, mitigation, or treatment of any disease or condition from which the injured person suffers as a result of the injuries, and the sequelae thereof, sustained by the claimant on the date the injury was sustained. The trustee shall have the same fiduciary duties as imposed upon a trustee by the Louisiana Trust Code. Nothing herein shall limit the rights of claimants to contract with respect to attorney fees and costs. [Emphasis added.]
To ascertain which of the Act’s provisions regarding damage awards apply to Ms. Fecke’s case — either the provision applicable to an award against the state or a state agency, La. R.S. 13:5106(B)(3)(c), or the provision applicable to damage awards against. a political subdivision, La. R.S. 13:5106(B)(3)(a) — this court must determine whether the LSU Board is classified as the “state or a state agency” or as a “political subdivision.” The Act defines a “state agency” as “any board, commission, department, agency, special district, authority, or other entity of the state.” La. R.S. 13:5102(A). The Act defines a “political subdivision” as “[a]ny parish, municipality, special district, school board, sheriff, public board, institution, department, commission, district, corporation, agency, authority, or an agency or subdivision of any of these, and other public or governmental body of any kind which is not a state agency.” La. R.S. 13:5102(B)(1).
The starting point in the interpretation of any statute is the language of the statute itself. Whitley v. State ex rel. Bd. of Supervisors of Louisiana State Univ. Agr. Mech. College, 11-0040 (La.7/1/11), 66 So.3d 470, 474. When the wording of a section of the revised statutes is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit. La. C.C. art. 9; La. R.S. 1:4. “Words and phrases shall be read with their context and shall be construed according to the common and approved usage of. the language.” La. R.S. |ml:3. Based on the clear language of La. R.S, 13:5102(A) and (B), the LSÜ Board is a state agency.[4] Because the LSU Board is a state agency, the Act’s provision applicable to awards for future medical care against the state or a state agency — La. R.S. 13:6106(B)(3)(c) — applies to the instant case. Thus, the trial court legally erred in applying La. R.S. 13:5106(B)(3)(a) to this case. That legal error became prejudicial when the trial court rendered judgment on the jury’s verdict and ordered *338 that Ms. Fecke’s damage award for her future medical care be placed in a rever-sionary trust, which the trial. court referred to as a “Future Medical Care Trust.”[5] We therefore amend the portion of the trial court’s October 3, 2014 final judgment that refers to a “Future Medical Care Trust” to refer to,the “Future Medical Care Fund.”
In addition to its argument that the trial court legally erred in establishing a reversionary trust for Ms. Fecke’s future medical care instead of ordéring that those benefits be paid from the FMCF, thé LSU Board further contends that'the trial court legally erred when it (i) ordered that costs and judicial interest be paid out of and earned on Ms. Fecke’s damage award for future medicals, and (ii) ordered that attorney’s fees be taken out of that award prior to the establishment of a reversionary trust. :
In Section 5106(B)(3)(c), referring to La. R.S. 39:1533.2, provides that a claimant’s future medicals are paid from the FMCF “directly to the provider as they are incurred.” The FMCF is established by La. R.S. 39:1533.2, which provides:
A. There is hereby established in the state treasury the “Future Medical Care Fund”, hereinafter referred to as the “fund”. The fund shall consist of such monies transferred or. appropriated to the fund for the purposes of funding medical care and related benefits that may be incurred subsequent to judgment rendered against the state or a state agency as provided. by R.S. 13:5106 and as more specifically provided in R.S. 13:5106(B)(3)(c). All costs or expenses of administration of the fund shall be paid from the fund.
B. The fund shall be administered by the treasurer on behalf of the office of risk management for the benefit of claimants suing for personal injury who are entitled to medical care and related benefits that may be incurred subsequent to judgment. Except for costs or expenses of administration, this fund shall be used only for payment of losses associated with such claims. At the close of each fiscal year, the treasurer •shall transfer to the Future Medical Care Fund from the Self-Insurance Fund an amount equal to the monies expended from the Future Medical Care Fund during that fiscal year. Monies in the fund shall be invested by the state treasurer- in the same manner as monies in the state general fund. Interest earned on investment of monies in the fund shall be deposited in and credited to the fund. All unexpended and unencumbered monies in the fund at the end of the fiscal year shall remain in the fund. [Emphasis added.]
Ms. Fecke is entitled to receive costs and interest on her damage award in accordance with La. R.S. 13:5112 of the Act; however, pursuant to La. R.S. 39:1533.2 (which the Act refers to in Section 13:5106(B)(3)(c)), any interest specifically earned on the award for Ms. Fecke’s future medical care “shall be deposited in and credited to” the FMCF. Thus, to the extent that the October 3, 2014 judgment of the trial court awards interest directly to Ms. Fecke’s on her future medical care award, that portion of the judgment is hereby vacated.
With regard to costs and attorney’s fees, this court notes that when a rever- *339 sionary trust is established -by a political subdivision for the payment of a claimant’s future medical care and related benefits, the statute does not limit the rights of a claimant to contract with respect to attorney fees and costs. La. R.S. |1213:5106(D)(3). Ms. Fecke argues that this provision of the Act authorizes the trial court to approve her contract with her lawyer for reasonable attorney’s fees which may be deducted from the jury’s damage award for her. future medical care, prior to the establishment of the reversion-ary trust. Ms. Fecke’s contention regarding reversionary trusts is valid, but, -as we have previously . held, the reversionary trust provisions contained in La, R.S. 13:5106(B)(3)(a) and (D)(3) do not apply to her suit for personal injury against the LSU Board.
Louisiana Revised Statutes 13:5106(D)(1) defines “[mjedical care and related benefits” as “all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services, and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services.” Thus, the only monies to be paid to a provider from the FMCF for Ms. Fecke’s future medical care are those' things defined in Section 13:5106(D)(1). Nowhere in the statutes pertaining to the FMCF does it provide for costs or attorney’s fees to be paid therefrom. Furthermore, costs and attorney’s fees are not “medical care and related benefits” set forth in La. R.S. 13:5106(D)(1). See Starr v. State ex rel. Dept, of Transp. & Dev., 46,226 (La.App. 2 Cir. 6/17/11), 70 So.3d 128, 144, writs denied, 11-1835, 11-1952, 11-1625 (La.10/21/11), 73 So.3d 386-88 and 12-2146 (La.10/12/12), 98 So.3d 877.
We also note that a lump sum is not placed in the FMCF on Ms. Fecke’s behalf, out of which costs and attorney’s fees could be paid directly to her attorneys. As set forth in the statutory scheme, Ms. Fecke’s future medical care will be paid from the FMCF directly to her medical provider as her medical care is incurred.[6] La. R.S. 13:5106(B)(3)(c). Therefore, the portions of the October 3, 2014 judgment of the trial court, which ordered that costs and attorney’s fees be |ispaid out of Ms. Fecke’s damage-award for her future medical care, are hereby vacated.

Assignment of Error 2:

In its second assignment of error, the LSU Board contends that the trial court erred in éxcluding from trial a one-page Rock Climbing Wall Participation Agreement (“Agreement”) that was provided to Ms. Fecke by the LSU UREC employees, which she executed prior to climbing the Wall on the day of her accident. Prior to trial, Ms. Fecke filed a motion in limine to exclude the Agreement, arguing that the document constituted a waiver of liability to release the LSU Board from any and all liability for causing injury to Ms. Fecke. Such exclusion of liability waivers are null under Louisiana law. See La. C.C. art. 2004. The LSU Board opposed the motion. A hearing was held on Ms. Fecke’s motion in limine the day before commencement of the jury trial. The trial court granted the motion excluding the Agreement.
On the second day of the jury trial, the LSU Board moved to re-consider the motion in limine to exclude the Agreement. The LSU Board argued that portions of *340 the Agreement unrelated to the liability waiver, such as certifications regarding Ms. Fecke’s health, mental, and physical condition should- be permitted into evidence. The trial court considered entering into evidence a version of. the Agreement that redacted any mention of a waiver of liability; however, the trial court reasoned that a redacted document may cause confusion for the jury who might speculate over the contents of the redacted portions of the Agreement. Recognizing the need to provide the information contained in the “non-waiver of liability” paragraphs of the Agreement to the jury without causing confusion, the trial court opted to instruct the jury that Ms. Fecke certified to the LSU UREC employees that she was in good health and had no mental or physical conditions 114that would interfere with her safety or the safety of others. The parties stipulated to the disclosure, and counsel for the LSU Board proffered the Agreement.
On appeal, the LSU Board argues that the Agreement was more than a mere waiver of liability. It argues that the Agreement establishes that-Ms. Fecke was sufficiently educated and- understood the inherent risk of injury associated with the activity she was about to undertake and that the LSU UREC employees had properly screened Ms. Fecke prior to allowing her to climb the wall. The LEU Board avers that the Agreement constituted Ms. Fecke’s acknowledgment of the risks of climbing the wall, which is a significant factor in determining her fault, and that this information should have been presented to the jury. Ultimately, the LSU Board contends the Agreement is' relevant, highly probative, and its exclusion from evidence materially prejudiced the LSU Board in its ability to defend against Ms. Fecke’s allegations of negligence and the alleged breach of duty owed as the owner of the rock wall climbing facility. Specifically,- the LSU Board argues that Ms. Feeke’s acknowledgement regarding the risk of bodily injury, representations regarding her physical and mental capacity and understanding that she alone was to determine whether she was fit to participate in the activity, and her agreement to direct any questions to the climbing wall staff constituted her informed consent and acknowledgement of the risk of-climbing the indoor rock wall and are significant factors in determining her fault.
All relevant evidence is admissible, except as otherwise provided by law. La. C.E. art. 402'. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. La. C.E. art. 401. The trial court has great discretion in its consideration of evidentiary matters such as motions in limine. See Heller v. Nobel Insurance Group, 00-0261 (La.2/2/00), 753 So.2d 841. Thus on review, an appellate court must determine whether the 11Btrial court abused its great discretion in ruling on a motion in limine. Id. Pursuant to La. C.C.P. art. 1636, when a trial court rules against the admissibility of any evidence, the court shall either permit the party offering such evidence to make a complete record thereof or permit the party to make a statement setting forth the nature of the evidence. Article 1636 is mandatory, not discretionary. Williams v. Williams, 06-2491 (La.App. 1 Cir. 9/14/07), 970 So.2d 633, 640. The purpose of requiring a proffer is to preserve excluded evidence so that the testimony or evidence is available for' appellate review of a trial court’s erroneous ruling. When legal error has been found and a complete record has been made through a proffer, the appellate court is able to conduct a de novo review of the record, including the proffered evi *341 dence, to render a decision on appeal. Id. We now review the proffered Agreement de novo to determine whether the trial court committed legal error in excluding the Agreement and whether that legal error prejudiced the LSU Board’s defense.
The Agreement is a one-page document signed by Ms. Fecke that contains eight paragraphs. The first three paragraphs provide as follows:
I understand and agree that there is a risk of serious injury to toe while utilizing University Recreation facilities, equipment, and programs and recognize every activity has a certain degree of risk, some more than others. By participating, I knowingly and voluntarily assume any and all risk of injuries, regardless of severity, which from time to time may occur as a result of my participation in athletic and other activities through LSU University Recreation.
I hereby certify I have adequate health insurance to cover any injury or damages that I may suffer while participating, or alternatively, agree to bear all costs associated with any such injury or damages myself.
I further certify that I am in good health and have no mental or physical condition or symptoms that could interfere with my safety or the safety of others while participating in any activity using any equipment or facilitates of LSU University Recreation. I understand and agree that I alone am responsible to determine whether I am physically and mentally fit to participate, perform, or utilize the activities, programs, equipment or facilities available at Louisiana State University, and that I am not relying on any advice from LSU | ^University Recreation in this regard. To the extent I have any questions or need any information about my physical or mental condition or limitations, I agree to seek professional advice from a qualified physician.
The fourth paragraph of the Agreement provides as follows:
Further, I hereby RELEASE AND HOLD HARMLESS, the State of Louisiana, the Board of Supervisors of Louisiana State University and Agricultural & Mechanical College, and its respective members, officers, employees, student workers, student interns, volunteers, agents, representatives, institutions, and/or departments from any and all liability, claims, damages, costs, expenses, personal injuries, illnesses, death or loss of personal property resulting, in whole or in part, from my participation in, or use of, any facility, equipment, and/or programs of Louisiana State University.
The remaining paragraphs of the Agreement provide as follows:
I will wear proper protective equipment and I agree to abide by all rules of the sport as mandated by LSU University Recreation.
I, the undersigned, am at least eighteen (18) years of age or have a parent/legal guardian’s signature, will not use an auto-belay system if weighing less than 90 pounds, am physically fit, have read this participation agreement, and understand its terms and conditions. I agree not to climb onto the top of the structure and stay directly under the rope or belay system I am using. Any certifications, including belay certifications, are good only at the LSU’s Baton Rouge campus, Student Recreation Center, and are not transferable to any other person.
Any questions concerning equipment to be used should be directed to Climbing Wall Staff prior to engaging in this activity. The wall is not designed for rappelling from the top of the tower. Do *342 ing so may. result in serious physical injury to the participant and/or bystanders.
At various times throughout the semester, University Recreation will be taking digital images, photographs, and/or videotapes of patrons [for] educational, promotional and informational purposes for usé in department related print materials and on our Web site. When/if your likeness or image is used in a publication, there will be no identifying information provided. [Emphasis added.]
Louisiana Civil Code article 2004 provides:
Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.
Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party.
|17Based on our review of the proffered Agreement, paragraph four is null pursuant to La. C.C. art. 2004 because it, in advance, excludes th'e liability of the LSU Board for causing physical injury to Ms. Fecke. The trial court properly excluded that portion of the Agreement from consideration by the jury. The issue then becomes whether a redacted version of the Agreement, with the remaining paragraphs that' do not exclude or limit the liability of the LSU Board, should have come into evidence. As per the agreement of the parties, the trial court gave the jury an instruction, instead of providing a redacted version of the Agreement, and disclosed these minimal facts to the jury:
They stipulate that when Brandy Fecke arrived at the LSU Recreational Center on that evening she certified to them that she was in good health and had no mental or physical condition or symptoms that could interfere with her safety or the safety of others while participating in any activity using any equipment or facilities of LSU University Recreation; . further, that she was at least 18 years of age and was physically fit. So that’s again, as I said, a stipulation is the parties agree those are the facts and they don’t need to have witnesses and so forth testify to that.
Despite the trial court’s instruction to the jury, the LSU Board argues that- each paragraph of the Agreement is highly probative as to the fault of the parties and that this probative value substantially outweighs any potential confusion or misleading of the jury that could have resulted from the introduction of the Agreement at trial. During the jury trial, a rock climbing expert for the plaintiff, Dan Pervorse, testified regarding the LSU Board’s duty to Ms. Fecke. Mr. Pervorse stated that the LSU Board failed to provide Ms. Fecke with an adequate warning as to the potential for significant physical injury associated with rock climbing. He further stated that the LSU UREC employees failed to properly screen and instruct Ms. Fecke prior to allowing her to climb. Mr. Pervorse further testified that the LSU Board failed to follow proper safety procedures, including the requirement that a climber who is bouldering must have a spotter standing behind the climber to provide assistance to the climber and help prevent injuries. | tsThe LSU Board argues that, had it been allowed to enter the Agreement into evidence and use it during its cross-examination of Mr. Pervorse, his expert testimony would have been significantly diminished and may have resulted in a different allocation of fault to the LSU Board.
Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under the general negligence principles of La. C.C. art. 2315. For liability for damages to attach under- a *343 duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a.. specific standard of care (the- duty element); (2) the defendant failed to conform his or her. conduct to the appropriate standard of care (the breach of duty element); (3) the, defendant’s substandard conduct was a cause in fact of the plaintiffs injuries (the cause in fact element); (4) the defendant’s substandard conduct was a legal .cause of the plaintiffs injuries (the scope of protection element); and (5) actual damages (the damage element). Rideau, 970 So.2d at 573.
Rock climbing is a recreational activity that involves substantial risk. Many other recreational activities such-as weight lifting and swimming also involve a substantial degree of risk. The risks associated with these and other physically-challenging sports, are well recognized. The duty on the gym operator, when these types of sports are conducted, is one of reasonable care under the circumstances— to provide a sound and secure environment for undertaking a clearly risky form of recreation and not that of removing every element of danger inherent in rock climbing. Ravey v. Rockworks, LLC, 12-1305 (La.App. 3 Cir. 4/10/13), 111 So.3d 1187, 1192. The LSU Board did not have a duty to warn Ms. Fecke as a climber about the potential effect of gravity. A warning that “if you fall you might get hurt,’-’ is obvious and universally known. See Henshaw v. Audubon Park Com’n., 605 So.2d 640, 643 (La.App. 4. Cir.), writ denied, 607 So.2d 570 (La.1992).
A gym and its facilities are not the insurers of the lives or safety of its patrons. A gym cannot be expected to foresee of guard against all dangers. Furthermore, the gym must only take reasonable precautions under the circumstances to avoid injury. Ravey, 111 So.3d at 1190-91. To prove negligence on the part of the LSU Board, Ms. Fecke must show both a failure, to provide reasonable training and supervision under the circumstances, as well as proof of a causal connection between .the lack of reasonable training/supervision and the accident. See Ravey, 111 So.3d at 1191.
The LSU UREC maintains an “Indoor Climbing Wall Manual,” which governs the rules, use, and maintenance of the indoor rock wall climbing facility. The manual requires the following of all employees of the indoor rock wall climbing facility:
1. Full knowledge of facilities and programs —
2. Ability to seek answers to questions.
3. Provide-consistency and continuity.
4. Carry out assigned routine and non-routine tasks.
5. Follow and enforce staff and program policies and procedures.
6. . Maintain a safe and enjoyable recreation environment.
Employees.are required to know and enforce all climbing wall and LSU UREC rules.
The manual distinguishes between the climbing wall and the bouldering wall. The climbing wall utilizes a safety rope belay system, where a climber climbs the wall while strapped into a harness and is “belayed’? via ropes by' an LSU- UREC employee. Bouldering, as opposed to rope climbing while wearing a harness, does not involve the use of ropes and requires the climber to traverse the boulder wall from side-to-side instead of climbing up the wall. The manual lists the following rules for bouldering: . .
htiL Before r bouldering the climber must check in at the desk.
2. The number of climbers at any one time may be limited to ensure *344 proper supervision. When people are using climbing ropes, boulder-ing on walls behind them, may be stopped. Bouldering may be limited based on climber’s/belayer’s location on the wall.
3.The climber may not boulder above or below any other climbers and must be sure that pants pockets are empty.
4. A bouldering sequence may be marked with tape.
5. Only the climbing staff may switch holds if necessary.
6. Spotting is required as boulder-ing can become quite demanding and may involve moves increasing the possibility of the climber coming off the wall in an awkward position. A spotter is required, to provide assistance to prevent injuries. Help all spotters to make sure that they are using proper technique and understand the purpose of spotting.
7. Participants are required to properly use crash pads at all times, a spotter may help to position crash pads.
8. Intentional jumping off the wall is not allowed. Please, climb down.
9. Please remove all hand jewelry and long necklaces. Clean athletic shoes, running shoes, or climbing shoes are the only shoes permitted. Shirts must be worn at all times. Tie hair back when necessary..
10.Be safe, be creative, have fun! [Emphasis added.]
Furthermore, the LSU UREC employees are required to instruct patrons who intend to climb in accordance with the guidelines contained in a “safety clinic” document. The safety clinic requires the LSU UREC employees to give examples of danger areas and instruct climbers where to fall on crash pads, which must be placed underneath bouldering climbers at all times. The safety clinic requires the LSU UREC employees to give an example of the technique of spotting and have the participating climbers demonstrate spotting. Section 6 of the safety clinic provides:
a. Every climber must request a spotter when applicable, i.e. when climbing at one’s limit or climbing into a situation that could yield a long or awkward fall.
b. Proper spotting techniques:
i. The role of the spotter is to first assist the climber in landing properly on their feet in the upright position. Secondly, to protect the climber’s head from hitting something hard (floor, wall, etc.).
ii. Hands up, thumbs in (spoons not forks).
iii. Dominant leg back, to use as a brace.
iv. Do not catch the climber; help them regain proper balancing while landing.
| aiThe safety clinic also requires the LSU UREC employees to demonstrate how to properly descend the wall, and in the event of a fall, how to properly land on the ground to reduce injuries.
At trial, Ms. Fecke, her friend Mr. Cu-lotta, and the two LSU UREC employees who were working the night of the accident, Emanuel Andrews and Andrew Whitty, testified as to the events.[7] Ms. Fecke testified that after having her course form signed and executing the Agreement, Mr. Whitty gave Ms. Fecke and Mr. Culotta a “few minutes or so” of *345 instruction. She stated that the climbing wall employees made no clear distinction between rope climbing with a harness or bouldering. Mr. Whitty asked if she wanted to wear a harness, but she declined, stating that she and Mr. Culotta wanted to climb “whatever [wall] was easiest,” to which he indicated they could climb the back 13' 1" bouldering wall located on the rear wall. Ms. Fecke also testified that Mr. Whitty indicated to her that most people climbed without a harness and that it was “up to her” whether she wanted to climb while wearing a harness. Mr. Culot-ta suggested that she wear a harness, which Ms. Fecke took as a joke stating, “[t]he worker at the wall didn’t make me feel like it was necessary and said most people didn’t, so I didn’t think it was something I had to do.”
Ms. Fecke testified that the employees did not ask her to demonstrate her climbing ability. She further stated that the employees did not explain the technique of climbing with a spotter or that spotting was required in order to climb the boulder wall and that she and Mr. Culotta never spotted each other. In terms of climbing instruction given by the employees, Ms. Fecke testified that “[o]ne of the guys climbed about half the wall quickly and came back down” in about thirty seconds and asked if they had any questions, which she stated she and Mr. Culotta |aadid not have at the time. Ms. Fecke testified that there wasn’t anything she “didn’t get” in terms of instruction about climbing the wall.
Mr. Culotta testified that he and Ms. Fecke arrived at the indoor rock wall climbing facility about an hour before closing. He stated that after he and Ms. Fecke indicated their relative climbing experience, the employees gave a “few minutes” of “some basic instruction,” and one of the employees demonstrated climbing up the wall in about thirty seconds. Mr. Culotta stated that he did not remember any discussion of the spotting technique during the instruction by the climbing wall employees. Mr. Culotta further testified that he never spotted Ms. Fecke.
Andrew Whitty, one of the climbing wall employees working the night of Ms. Fecke’s accident, testified that he went over the rules and regulations of the climbing facility with Ms. Fecke and Mr. Culot-ta since they were both new climbers. Mr. Whitty testified that if a patron was new to the climbing wall, the employees would have to give a “brief sort of instruction” during which the employees would “go over certain things,” such as the difference between climbing with a rope and boulder-ing. Mr. Whitty stated that since Ms. Fecke and Mr. Culotta opted to climb the boulder wall since it was more convenient, he went over spotting techniques. Mr. Whitty testified that Mr. Culotta was spotting Ms. Fecke at the time of her fall. Mr. Whitty stated that he could not recall if there was a policy in place at the LSU UREC that required a spotter for a climber on the bouldering wall He also could not recall whether there was policy or procedures manual for the climbing wail, and if there was, he stated he did not refer to it often. Mr. Whitty testified that climbers were not tested for proficiency prior to climbing.
Emanuel Andrews, the other employee working the night of Ms. Fecke’s accident, witnessed Ms. Fecke as she fell from the wall. Mr: Andrews was standing approximately twenty feet from where Ms. Fecke and Mr. Culotta were [^climbing, in the middle of the room. Mr. Andrews testified that while Ms. Fecke climbed the wall, Mr. Culotta was standing in the correct position to spot her, but that as she fell, Mr. Culotta moved away from the wall and out of the spotting position.
*346 We also note that the plaintiffs expert on rock wall climbing, Mr. Pervorse, testified that the spotting technique, which should be used any time a climber traverses a bouldering wall, involves “having a good stance, one foot forward, one foot back, slightly wider than shoulder width so that you have a good support base and,, then your hands, up.” He further stated that the purpose of spotting is to “slow [the climbers’] fall, to keep them upright, keep them from falling over and. hurting their self further by potentially falling off a mat and hitting their head, to help steadying them when they do land.”
After our de novo review of the testimony and evidence presented at trial, we conclude that the LSU UREC employees failed to properly instruct, demonstrate, and certify that Ms. Fecke and Mr. Culot-ta understood the proper techniques for climbing the bouldering. wall in accordance with their duties as -described in the LSU UREC “Indoor Climbing Wall Manual” and the safety clinic document. While the employees may. have explained the spotting technique, Ms. Fecke and Mr. Culotta both testified that neither spotted the other as they climbed. Despite the LSU Board’s contention that the Agreement represents Ms. Fecke’s acknowledgment of the risks involved in rock wall climbing, as stated above, those risks are well-known. The only portion of the excluded Agreement that might have prejudiced the LSU Board’s case is the portion in paragraph five wherein Ms. Fecke certified.that she “agreefd] to abide by all rules of the sport as mandated by LSU University Recreation.” As discussed above, however, instruction as to those “rules” was not provided to Ms. Fecke by the LSU UREC employees nor was she properly screened or supervised as .she .climbed the boulder-ing wall.
^Paragraph four of the Agreement is. null because it, in advanee, excludes the liability of the LSU Board for causing physical injury to Ms. Fecke, but the remaining paragraphs of the Agreement are not illegal waivers of liability. Thus, we find that the trial court legally erred in excluding , a redacted version of the Agreement; however, we hold that the trial court’s error was-not prejudicial. The inclusion of the remainder of the Agreement at trial could not have permissibly changed the jury’s verdict based on our de novo review of the record.

Assignment of Error 3:.

In the third and final assignment of error, the LSU Board asserts that the trial court improperly instructed the jury on the award of damages for the “loss of future earnings” when the trial court should have instructed the jury on damages for the “loss of future earning capacity.” It is undisputed that at the time of Ms. Fecke’s accident, she was an unemployed senior college student at LSU. Ms. Fecke later graduated from LSU with a degree in kinesiology and obtained a secondary degree as a physical therapy assistant. At the time of trial, she was employed as a physical therapy assistant, but testified that she had recently taken on a less strenuous, and lower paid, physical therapy assistant job due to her injuries. The LSU Board argues that because Ms. Fecke was unemployed at the time of her accident, she suffered no loss of earning or loss of future earnings, but rather suffered a loss of future earning capacity.
The distinction between a damage award for the loss of future earnings and the loss of future earning capacity is crucial in this case because as a state agency, the LSU Board’s liability for damages for an award of loss of future earning capacity is included in the $500,000.00 cap on dam *347 ages pursuant to La. R.S. 13:5106(B)(1), In contrast, damages for a loss of future earnings, as was awarded by the jury to Ms. Feeke based on the instruction given by the trial court, are excluded from the $500,000.00 damages cap. La. R.S. 13:5106(B)(1); see also Cooper v. Public Belt R.R., 03-2116 (La.App. 4 Cir. 10/6/04), 886 So.2d 531, 539, writ denied, 04-2748 (La.1/28/05), 893 So.2d 75 (the $500,000.00 cap on damages in actions against governmental units applied to damages for loss of future earning capacity; loss of future earning capacity was not the same as a loss of future earnings, and thus, it did not fall within an exception to the cap). It therefore behooves this court to determine whether or not the jury instruction given by the trial court on a loss of future earnings was proper.
Louisiana Code of Civil Procedure article 1792(B) requires a district judge to instruct the jury on the law applicable to the case submitted to them. The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate. Wooley v. Lucksinger, 09-0571 (La.4/1/11), 61 So.3d 507, 573. The question here is whether the district judge adequately instructed the jury, as that concept has been defined in the jurisprudence:
Adequate jury instructions are those which fairly and reasonably point" out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and. may' constitute reversible error. ., . .
Wooley, 61 So.3d at 574 (citing Adams v. Rhodia, Inc., 07-2110 (La.5/21/08), 983 So.2d 798, 804.).
Generally, the giving of an allegedly erroneous jury instruction will not constitute grounds for reversal unless the instruction is erroneous and'the' complaining party has been injured or prejudiced thereby. In fact, Louisiana jurisprudence is well established that a reviewing court must exercise great restraint before it reverses a jury verdict due to an erroneous jury instruction. Wooley, 61 So.3d at 574. When a reviewing court finds the jury was erroneously instructed and the error probably [¡^contributed to the- verdict, an appellate court must set aside the verdict. Wooley, 61 So.3d at 574. •
" In order to determine whether an erroneous jury instruction was given; reviewing courts must assess the targeted portion of the instruction in the context of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings -and the evidence and'whether the charges adequately guided the jury in its determination. The ultimate inquiry on appeal is whether the jury instructions misled the jury to such an extent that the jurors were prevented from dispensing justice.'- The law is clear the review function is not complete once error is found. Prejudice to the complaining party cannot automatically be assumed from the mere fact of an error. Instead, the reviewing court must then compare the degree of the error with the adequacy of the jury instructions as a whole and the circumstances of the case. Wooley, 61 So.3d at 574.
Louisiana Revised Statutes 13:5106(D)(2) defines “loss of future earnings” as “any form of economic loss which *348 the claimant will sustain after the trial as a result of the injury ... which forms the basis of the- claim.” In contrast, loss of earning capacity is not the same as lost earnings. Rather, earning capacity refers to a person’s potential. Batiste v. New Hampshire Ins. Co., 94-1467 (La.App. 3 Cir. 5/3/95), 657 So.2d 168, 170, writ denied, 95-1413 (La.9/22/95), 660 So.2d 472. The Louisiana Supreme Court has held that damages for a loss of earning capacity should be estimated on the injured person’s ability to- earn money, rather than what he actually earned before the injury. Earning capacity in itself is not necessarily determined by - actual loss. Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990); Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979). The claimant need not be working or even in a certain profession to recover an award for loss of future earning capacity. Brandao v. Wal-Mart Stores, Inc., 35,368 (La.App. 2 Cir. 12/19/01), 803 So.2d 1039, 1043, writ denied, 02-0493 (La.4/26/02), 814 So.2d 558. Damages may be .assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. Hobgood, 574 So.2d at 346; Folse, 371 So.2d at 1124.
An award for loss of earning capacity is inherently speculátive and cannot be calculated with absolute certainty. The most the courts can do is exercise sound discretion and make an award that in light of all facts and circumstances is fair to both parties while not being unduly oppressive to either. In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the ■ trial court should consider whether and how much plaintiffs current condition disadvantages her in the work force. Henry v. National Union Fire Ins. Co., 542 So.2d 102, 107, writ denied, 544 So.2d 405 (La.1989) and 544 So.2d 405 (La.1989). Factors to be considered in fixing awards for loss of earning capacity include: age, life expectancy, work life expectancy, past work record, appropriate discount rate, the annual wage rate increase or productivity increase, prospects for rehabilitation, probable future earning capacity, loss of earning ability, and the inflation factor or" decreasing purchasing power of the applicable currency. Henry, 542 So.2d at 107; Brandao, 803 So.2d at 1043.
Experts at trial testified that Ms. Fecke would likely have to change career paths— from a physical therapy assistant to a job in a more sedentary position — at some undetermined point in the future due to her injuries. Stephanie Chalfin, a vocational rehabilitation expert, presented options for potential new careers for Ms. Fecke. Harold Asher, a certified public accountant and an expert in the projection of economic loss testified as to Ms. Fecke’s potential maximum salary as a | ^physical therapy assistant (which was provided by Ms. Chalfin). Mr. Asher then calculated the difference between the hypothetical salary and Ms. Fecke’s potential earning capacity under three scenarios: Ms. Fecke remaining in her field as a physical therapy assistant, obtaining employment as a social worker, or obtaining employment as a rehabilitation counselor. Mr. Asher projected his figures over the anticipated work life of Ms. Fecke and considered a number of factors including her age, how long he expected her to continue working, her motivation to work, growth rate, and wages anticipated each year of her work life.
The jury instructions were lengthy, and this is the only reference therein to a *349 damage award for “loss of future earnings”:
Under the loss of future earnings component of damages, the plaintiff is entitled to recover damages for the deprivation of what she should have earned but for the injury. Such damages are calculated on the plaintiffs ability to éarn money in her chosen career compared to what she can now earn because of her injury. In determining such an award, you may consider plaintiffs physical condition and mental status before and after this incident, her work record, her earnings in prior years, the probability or improbability that she would have earned similar amounts in the remainder of her work life, and similar factors. And since, if you make an award, plaintiff would be receiving today sums of money that otherwise she would only receive over a number of years in the future, the law requires that you discount or reduce it to its present value, which is what the experts in this case have already done.
The LSU Board objected to the jury instruction given by the trial court regarding damages for “loss of future earnings.” The trial court, after citing to the Fourth Circuit’s decision in Cooper, 886 So.2d 531, and the Louisiana Supreme Court’s decision in Folse, 371 So.2d 1120, stated:
The cases dealing with loss of future earnings dealt with cases where the injured plaintiff was already in a certain career or profession or job description and they could not continue on in that same job. The evidence in this case was that Ms. Fecke was, despite her injury, able to qualify and go into her chosen profession of physical therapy assistant, but because of her injury will not be able to continue in that type of employment and must therefore seek other employment which may or may not pay less, as indicated by the experts who testified.
|g8So for that reason, I felt that this was more loss of future earnings as opposed to loss of earning capacity. So that’s why I gave that charge as opposed to a future earning capacity charge or a future earning capacity entry on the verdict form. ■
Unlike the trial court’s reasoning, the Louisiana Supreme Court has drawn a distinction between “pecuniary loss” and a “loss of earning capacity.” The supreme court explained the rationale behind the concept of loss of future earning capacity as opposed to loss of future earnings by stating that “the theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.” Folse, 371 So.2d at 1123. Further, by noting that proof of loss of future earning capacity does not require proof of future monetary loss, the supreme court reinforces the conclusion that loss of future earning capacity is not an “economic loss” within the intendment of La. R.S. 13:5106(D)(2). See Folse, 371 So.2d.at 1123. Therefore, like the Fourth Circuit in Cooper, we hold that “pecuniary loss,” as used in Folse by the supreme court, is synonymous with “economic loss” as employed in La. R.S. 13:5106(D)(2). See Cooper, 886 So.2d at 539. Thus, Ms. Fecke suffered a loss of future earning capacity as a result of her injury. It is impossible for her to receive an award for loss of earnings or loss of future earnings because she suffered no economic loss as a result of her accident since she was unemployed at the time.
The jury awarded damages estimated on Ms. Fecke’s potential to earn money in the future, which is her future earning capacity. Based on the law, the expert testimony, and the evidence intro *350 duced at trial, we find that the trial court’s instruction regarding loss of future earnings was erroneous. Furthermore, we find that the error was prejudicial to the LSU Board, - particularly with regard to the $500,000.00 liability cap, pursuant to La. R.S. 13:5106(B)(1), on. a damage award for a loss of future' earning capacity. The error resulted in an award to Ms. Fecke that was a larger amount than she was statutorily entitled to receive. The judgment |snwarrants amendment based on the degree of this error combined with the adequacy of the jury instructions as a whole and the circumstances of this case. Therefore, we .amend the portion of the October 3, 2014 judgment of the trial court, which awarded Ms. Fecke damages for loss of future earnings, to award Ms. Fecke those damages as her loss of future earning capacity. We furthermore amend the judgment to cap Ms. Fecke’s damages, exclusive of her medical care and related benefits, at $500,000.00 in accordance with La. R.S. 13:5106(B)(1).
We further note that the modification of Ms. Fecke’s damages award extinguishes the loss of consortium award to Karen Fecke. Louisiana Revised Statutes 13:5106(D)(4) provides that “ ‘[derivative claims’ include but are not limited to claims for survival or loss of consortium.” A claim for loss of consortium pursuant to La. C.C. art. 2315(B) is a derivative claim, derivéd from damages to the primary plaintiff. An award of general damages in the maximum amount of $500,000.00 as allowed by statute in actions against state agencies and/or political subdivisions of the state serves to legally extinguish any derivative awards for loss of consortium, services, and society. See Jenkins v. State ex rel. Dept. of Transp. & Dev., 06-1804. (La.App. 1 Cir. 8/19/08), 993 So.2d 749, 778, writ denied, 08-2471 (La.12/19/08), 996 So.2d 1133. We therefore reverse the trial court’s judgment in part and vacate the award of. damages for loss of consortium to Karen Fecke.

DECREE

We amend the portion of the trial court’s October 3, 2014 final- judgment, which orders that Ms. Fecke’s award of $750,000.00 for medical care and related benefits incurred subsequent to judgment be placed in a reversionary “Future Medical Care Trust,” to order that Ms. Fecke’s award of $750,000.00 for medical care and related benefits incurred subsequent to judgment be paid from the Future Medical Care Fund in accordance with La. R.S. 39:1533.2. The portions of the |3) judgment awarding interest directly to Ms. Fecke and ordering that attorney’s fees and costs be paid out of Ms. Fecke’s damage award for her medical care and related benefits incurred subsequent to judgment are hereby reversed. Furthermore, the portion of the October 3, 2014 judgment of the trial court, which awarded Ms. Fecke damages in the following amounts.
Physical Pain and Suffering, Past and Future: $112,500.00
Mental Pain and Suffering, Past and Future: $93,750.00
Loss of Enjoyment of Life: $56,250.00
Permanent Disability and' Scarring: $128,750.00
Loss of Future Earnings: $262,500.00
TOTAL (exclusive of medical care and related benefits) $648,750.00
is hereby amended to cap the total amount of damages,' exclusive of medical care and related benefits, to $500,000.00 as mandated by La. R.S. 13:5106(B)(1), We reverse and vacate the trial court’s award for loss *351 of consortium to Karen Fecke. The remainder of the judgment is .affirmed.-
REVERSED IN PART, AMENDED IN PART, AND AFFIRMED AS AMENDED.
GUIDRY, concurs in the result.

. Although this point will be discussed more thoroughly in the first assignment of error, we note here, for clarification purposes, that the trial court's judgment names the reversionary trust the “Future Medical Care Trust.” We observe the label “Future Medical CaVe Trust” appears nowhere in La. R.S. 13:5106, nor in any other provision in the Louisiana Governmental Claims Act, La. R.S. 13:5101— 5113.

. -Louisiana Revised Statutes 13:5106(D)(1) provides that:
"Medical care and related benefits” for the purpose of this Section means all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services, and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services.

. Louisiana Revised Statutes 13:5106(B)(3)(a) and (D)(3), relative to the creation of rever-sionary trusts, were added by 1996 La. Acts No. 63, § 1 (effective May 9, 1996). 2000 La. Acts No. 20, § 1 (effective July 1, 2000) amended La. R.S. 13:5106(B)(3)(a) and (D)(3) to provide that the creation of reversionary trusts for the payment of future medical care specifically applies to personal injury claims against political subdivisions.

. We note that there is constitutional and statutoiy authority for the classification of the LSU Board as a state agency. We also note there is jurisprudence that has previously applied the Act to suits involving the LSU Board. In those instances, courts applied'the provisions of the Act applicable to state agencies to the LSU Board. See La. Const. art. VIII, § 7; La. R.S. 13:5102(A): La. R.S. 39:1527(C); Whitley, 66 So.3d at 476; LeBlanc v. Thomas, 08-2869 (La. 10/20/09), 23 So.3d 241, 246; Student Govt. Association of Louisiana State Univ. Agr. & Mech. College, Main Campus, Baton Rouge v. Board of Supervisors of Louisiana State Univ. Agr. & Mech. College, 262 La. 849, 867-68, 264 So.2d 916, 922 (1972) (Barham, J., dissenting); Hunter v. Louisiana State Univ. Agr. & Mech. College ex rel. Louisiana Health Care Services Center for Univ. Hosp. at New Orleans, 10-1406 (La.App. 4 Cir. 6/8/11), 77 So.3d 264, 267, reversed on other grounds, 11-2841 (La.3/9/12), 82 So.3d 268.

. The trial court's judgment ordered that Ms. Fecke’s future medicals be placed in a "Future Medical Care Trust” in accordance with La. R.S. 13:5106(B)(3)(c); however, as we have discussed, Section 5106(B)(3)(c) applies to the state and state agencies and governs the placement of a claimant's future medicals in the Future Medical Care Fund, not a trust.

. The statutory scheme that creates and governs the organization and management of the FMCF is analogous to the statutory scheme that creates and governs the "Patient's Com-pensatidn Fund,” the fund established for the payment óf medical malpractice claims. See La.'R.S. 40:12’99.43-'44.

. The deposition of Andrew Whitty was read in open court.