# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2019 CA 0964

### KELLY JUNEAU, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILD, CHAYSE JUNEAU

### VERSUS

### LOUISIANA TENNIS ASSOCIATION, INC., ACADIANA COMMUNITY TENNIS ASSOCIATION, INC., UNITED STATES TENNIS ASSOCIATION, INC., AND SOUTHERN TENNIS ASSOCIATION, INC.

Judgment Rendered:  FEB 2 7 2020

* * * * * *

On Appeal from the Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Docket No. C636813, Sec. 21/D

Honorable Janice G. Clark, Judge Presiding

* * * * * *

| | |
|---|---|
| Ashley F. Barriere<br>Stephen M. Huber<br>Brian P. Marcelle<br>New Orleans, Louisiana | Counsel for Plaintiff/Appellant,<br>Kelly Juneau, individually and on behalf of<br>her minor son, Chayse Juneau |
| Michael W. McKay<br>Douglas J. Cochran<br>Baton Rouge, Louisiana | Counsel for Defendant/Appellee,<br>United States Tennis Association, Inc. |

* * * * * *

BEFORE:  WHIPPLE, C.J., GUIDRY, AND BURRIS,[1] JJ.

---

[1]  Judge William J. Burris, retired, serving *pro tempore* by special appointment of the Louisiana Supreme Court.

**BURRIS, J.,**

The plaintiff seeks review of a judgment that granted the motion for summary judgment filed by the United States Tennis Association (USTA), defendant, dismissing the plaintiff's claims against the USTA with prejudice. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

In May 2014, then-fourteen year old Chayse Juneau allegedly sustained heat-related injuries while participating in the Louisiana Junior Qualifier tennis tournament in Lafayette, Louisiana. While playing his second match of the day, Chayse's coach, Abrie DuPlooy, noticed that he was "not himself." According to Mr. DuPlooy, Chayse was "walking weird" and "didn't move the way he usually moves." Mr. DuPlooy called Kelly Juneau, Chayse's mother, who was nearby but was not watching the match. When Ms. Juneau arrived in the area where Chayse was playing, she observed that Chayse was "struggling" to breathe, was not steady on his feet, and appeared disoriented. Ms. Juneau located the official for Chayse's match, Marijane Jeansonne, advised that she was Chayse's mother, and asked Ms. Jeansonne to instruct Chayse that the "match is over with." In response to Ms. Jeansonne's inquiry as to why Ms. Juneau intended to end the match, Ms. Juneau explained her observations concerning Chayse's physical appearance. Because of the layout of the playing area, Ms. Juneau was not close enough to speak to Chayse directly; additionally, communication between a player and a parent during match play is considered coaching and is not allowed per tournament rules.

Ms. Jeansonne interrupted Chayse's match and advised him, "[Y]our mother has told me that you are not feeling well and she thinks that you need to stop playing." Chayse stated that he was fine and wished to continue the match. Ms. Jeansonne relayed Chayse's wishes to Ms. Juneau, who became "distraught" and continued to insist the match was over. According to Ms. Juneau, Ms.

2

Jeansonne threatened to ban her from the tournament if she entered the playing area to remove Chayse from the court. Ms. Jeansonne advised Ms. Juneau that if she was unhappy with the decision to allow Chayse to continue playing, she was "welcome to take this up with the head referee." This was not done, and Ms. Juneau continued to watch Chayse's match, from afar, until it was over.

After the match, Ms. Juneau and Chayse spoke to Ashley Rhoney, tournament director. Mr. Rhoney was unaware of the events that transpired during Chayse's match, and there is no indication that Ms. Juneau reported the incident to Mr. Rhoney or complained about Ms. Jeannsone's refusal to end Chayse's match. However, Mr. Rhoney and the medical trainer, Jennifer Pridmore, who was nearby, observed that Chayse "didn't look good." He appeared tired and dehydrated and his skin tone was "off." Ms. Pridmore was also unaware of Ms. Juneau's prior concerns for Chayse's health. Ms. Pridmore questioned Chayse concerning how much food and water he consumed before his match and concluded that he was dehydrated. Ms. Pridmore also learned that Chayse had taken a different, immediate release medication that morning, as opposed to his usual time-released dose, which she expected was likely contributing to his symptoms.

For the next hour or so, efforts to cool and rehydrate Chayse continued. Chayse and Ms. Juneau discussed whether Chayse wanted to, and was physically able to, play in the third match scheduled for later that afternoon. Ms. Juneau asked Chayse if he wanted to be examined by paramedics, who were positioned nearby at a college baseball game, but he declined. Eventually, once it became apparent that Chayse's condition would not improve without medical intervention, Ms. Juneau drove Chayse to a local hospital. Chayse was diagnosed with acute rhabdomyolysis and renal failure and remained hospitalized for three days. As a result of these injuries, Chayse purportedly continues to

3

suffer from exercise heat intolerance, unusual fatigue from simple tasks, muscle cramps, and cognitive issues.

The subject tennis tournament was organized and hosted by the Acadiana Community Tennis Association, Inc. (ACTA), an organizational member of the USTA. The USTA, whose principal office is located in New York, is the national governing body for the sport of tennis in the United States and is divided into 17 sectional associations. Each sectional association is empowered by the USTA to manage the sport of tennis in its geographical area, with the caveat that this be done in accordance with the USTA's constitution, bylaws, and regulations. The Southern Tennis Association is the sectional association that includes Louisiana. Sectional associations are composed of district associations, which are governed by their own rules and regulations adopted in accordance with the requirements of the parent sectional association. The Louisiana Tennis Association is the district association that governs tennis in the state. Community associations, like the ACTA, are the lowest USTA organizational level.

The Louisiana Tennis Association selected the ACTA to organize and host the 2014 Louisiana Junior Qualifier. The winner of the Louisiana Junior Qualifier competes in the Southern Tennis Association Junior Championship. The winner of the Southern Tennis Association Junior Championship then competes in the USTA Junior Championship.

Ms. Juneau filed the instant suit, individually and on behalf of Chayse, against the USTA, the Southern Tennis Association, the Louisiana Tennis Association, and the ACTA for injuries allegedly sustained by Chayse while participating in the 2014 Louisiana Junior Qualifier. The USTA filed the subject motion for summary judgment in August 2018, arguing that Ms. Juneau could not satisfy her burden of proving that it owed or breached a duty to Chayse and,

4

therefore, could not satisfy her burden of proving USTA's negligence at trial.[2] Ms. Juneau opposed the motion, primarily asserting that the USTA owed and breached a duty to train its officials/referees to recognize and respond to the signs and symptoms of heat-related illnesses and to train referees to stop a match at a mother's request when the request was based upon her child's illness. Ms. Juneau further asserts that the USTA had and breached a duty to implement appropriate policies and procedures concerning the recognition and treatment of heat-related illnesses.

The trial court granted the USTA's motion for summary judgment on January 16, 2019.[3] In response, Ms. Juneau filed the instant appeal, asserting the trial court erred in granting judgment in favor of the USTA, because genuine issues of material fact remain as to whether the USTA breached its duty to properly train referees and to implement appropriate policies and procedures.

## DISCUSSION

Appellate courts review summary judgments *de novo*, using the same criteria that governs the trial court's consideration of whether summary judgment is appropriate. **Moreno v. Entergy Corp.**, 2012-0097 (La. 12/4/12), 105 So.3d 40, 47. Per La. Code Civ. P. art. 966.A(3), a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show there is no genuine issue as to material fact and the mover is entitled to judgment as a matter of law.

The burden of proof on a motion for summary judgment rests with the mover. La. Code Civ. P. art. 966.D(1). When, as here, the mover will not bear the burden of proof at trial on the issue raised in the motion, the mover's burden

---

[2] The Southern Tennis Association and the Louisiana Tennis Association moved for summary judgment with the USTA; however, the trial court denied the motion as to these defendants. The portion of the judgment denying the motion as to these defendants is not at issue in this appeal.

[3] The trial court originally granted the USTA's motion in October 2018 but subsequently granted Ms. Juneau's motion for new trial. After hearing re-argument on the motion, the trial court again granted the USTA's motion for summary judgment in January 2019.

does not require him to negate all essential elements of the adverse party's claim. Instead, he must point out to the court the absence of factual support for one or more elements essential to the adverse party's claim. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. Code Civ. P. art. 966.D(1).

A genuine issue is a triable issue. In determining whether an issue is genuine, courts cannot consider the merits, make credibility determinations, evaluate testimony, or weigh evidence. **Tate v. Outback Steakhouse of Florida**, 2016-0093 (La. App. 1st Cir. 9/16/16), 203 So.3d 1075, 1077. A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. **Id**.

It is undisputed that the USTA had no involvement in planning or operating the 2014 Louisiana Junior Qualifier, and Ms. Juneau does not assert that representatives from the USTA were present at the event. She identifies Ms. Jeansonne as "the referee alleged to have acted negligently." However, it is undisputed that Ms. Jeansonne was not an employee of the USTA, and the ACTA was solely responsible for selecting and compensating tournament staff, including Ms. Jeansonne. Consequently, there is no basis to hold the USTA vicariously liable for any negligence allegedly attributable to Ms. Jeansonne. Therefore, Ms. Juneau must demonstrate that the USTA was directly negligent.

Ms. Juneau's theory of liability against the USTA rests on the general negligence principles of La. Civ. Code art. 2315. To succeed at trial, Ms. Juneau must satisfy all elements of the duty-risk analysis: duty, breach, cause-in-fact,

6

legal cause, and actual damages. **Pontchartrain Natural Gas System v. Texas Brine Company, LLC**, 2018-0631 (La. App. 1st Cir. 7/3/19), 281 So.3d 1, 6, writ denied, 2019-01423 (La. 11/12/19), 282 So.3d 224. A negative answer to any of the elements of the duty-risk analysis prompts a no-liability determination. **Id**.

Ms. Juneau's claim against the USTA is premised on the fact that the tournament was sanctioned by the USTA, and Ms. Jeansonne was a USTA-certified referee. The issue before the court is whether the USTA owed a duty to Chayse, where its only involvement with this tournament was sanctioning the event and certifying that Ms. Jeansonne was qualified to officiate the event in accordance with the USTA's rules of the game.

The threshold issue in any negligence action is whether the defendant owed the plaintiff a duty, and whether a duty is owed is a question of law. **Id**. The inquiry is whether the plaintiff has any law – statutory, jurisprudential, or arising from general principles of fault – to support the claim. **Lathan Company, Inc. v. State, Department of Education, Recovery School District**, 2016-0913 (La. App. 1st Cir. 12/6/17), 237 So.3d 1, 6, writ denied sub nom. **Lathan Company, Inc. v. State, Department of Education**, 2018-0026 (La. 3/9/18), 237 So.3d 1191. In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented. When no factual dispute exists and no credibility determinations are required, the legal question of the existence of a duty is appropriately addressed by summary judgment. **Id**. For the reasons that follow, we conclude that the USTA owed no duty to Chayse under the facts of this case.

**USTA Sanctioned the Louisiana Junior Qualifier**

First, Ms. Juneau contends that the USTA owed a duty to Chayse because it sanctioned the tournament. Andrew Walker testified via deposition as the

USTA's representative and explained that, to be "USTA-sanctioned" means that the USTA is paid a sanctioning fee, its regulations are followed, and the results of the tournament "count towards rankings."[4] Mr. Walker confirmed that the USTA does not require tournaments at the level of the Louisiana Junior Qualifier to be officiated by USTA-certified referees. Even if the event is sanctioned by the USTA, the decision to hire USTA-certified personnel to officiate a tournament at this level is made by the local organization and "would be dependent on section regulations."

Ms. Juneau primarily relies on the opinions of Dr. Douglas Casa, whom she describes as "the preeminent national expert in the recognition and prevention of heat stroke and other exertional heat-related illness in athletic sporting events…" Dr. Casa generally concluded that the "tennis tournament and those associations that supervise it's [sic] activities failed to meet minimum standards related to health and safety issues for their tennis tournament participants on May 30, 2014." However, as discussed, the ACTA had direct authority and control over this tournament. The USTA did not "supervise" the ACTA, and its involvement as the sanctioning-body was simply to supply the applicable rules of play and to permit the winner to advance to the next level of competition within the USTA tournament system.

**USTA Certified the Referee Used at the Louisiana Junior Qualifier**

We likewise find that Ms. Juneau cannot succeed at trial in establishing that the USTA had a duty to properly train referees, like Ms. Jeansonne, to recognize the signs and symptoms of heat-related illnesses or to stop a match at a parent's request, nor did the USTA have a duty to adopt adequate policies and procedures on the subject.

---

[4] Mr. Rhoney confirmed this is the level of involvement by the USTA when it sanctions an event.

8

Ms. Jeansonne served as a roving umpire or referee for this tournament and Chayse's match, specifically. She explained that players were responsible for officiating their own matches and for keeping score per USTA rules; however, she was assigned to oversee eight courts to ensure "fair play" and to assist players should a dispute arise. Ms. Jeansonne attended her first referee training through the USTA in 2007. Since that time, she estimates that she has served as a referee in 40-60 tournaments. Ms. Jeansonne also attends annual trainings required by the USTA, during which referees are educated on any rule changes.

Without identifying the legal source of the USTA's alleged duty, Ms. Juneau argues that the USTA recognized that it owed a duty to train officials regarding the signs and symptoms of heat-related illnesses by adopting its Friend at Court Manual. The Manual contains the organization's regulations and emergency care guidelines, including a section concerning "HEAT ILLNESS." The emergency care guidelines identify heat illness as an "acute medical condition that arises from a combination of dehydration and overheating within the body." The guidelines briefly explain when heat illnesses most commonly occur, *i.e.*, in hot and humid conditions, and identify common signs and symptoms.

Contrary to Ms. Juneau's argument, Mr. Walker, testifying on behalf of the USTA, explained that the emergency care guidelines are "focused" to tournament directors, like Mr. Rhoney, not referees, like Ms. Jeansonne. The training video shown to USTA-certified referees (as a "refresher") and to trainees hoping to become certified "references the existence" of the USTA emergency care guidelines and suggests that trainees "should" review the Manual.[5] The guidelines are not otherwise discussed during the referee training, and trainees are tested on techniques, procedures, code of conduct, and rules. Thus, it is evident that the USTA did not assume a duty to train its referees on this issue.

---

[5] In accordance with Mr. Walker's testimony, Ms. Jeansonne confirmed that she was not trained by the USTA to identify the signs or symptoms of heat-related illness.

9

See **McGowan v. Victory and Power Ministries,** 1999-0235 (La. App. 1st Cir. 3/31/00), 757 So.2d 912, 914, ("[I]if a person undertakes a task which he otherwise has no duty to perform, he must nevertheless perform that task in a reasonable and prudent manner.")

Ms. Juneau's reliance on Dr. Casa's opinions in this regard is also unavailing as we find that his opinions do not establish that the USTA owed a duty to Chayse.[6] Instead, Dr. Casa's conclusions focus on the conduct of the ACTA, Ms. Jeansonne, and Ms. Pridmore. Dr. Casa identified what he believes are the five "most egregious errors" by the defendants. Three of those concern the ACTA's failure to follow the USTA's Friend at Court Manual "regarding prevention, recognition, and treatment of exertional heat illnesses." Dr. Casa did not identify any perceived inadequacies in the Manual or the USTA's referee training program but, instead, cited the tournament's lack of emergency policies and procedures.

The remaining two "egregious errors" identified by Dr. Casa concern Ms. Jeansonne and Ms. Pridmore's response to Chayse's condition and the adequacy of the care he received. For instance, Dr. Casa finds fault in Ms. Jeansonne's failure to heed Ms. Juneau's requests to end Chayse's match, speculating that her decision was "likely due to [her] lack of knowledge related to the condition." However, there is no basis to hold the USTA liable for Ms. Jeansonne's decision. This is particularly true considering Mr. Walker's testimony that, per the USTA's rules, a parent has the authority to end a match. Mr. Walker further explained that the USTA does not have specific policies and procedures dictating the circumstances under which a referee should suspend (rather than end) a match

---

[6] Further, this court is not bound by the conclusory opinions of experts on the legal question of whether a duty existed under the facts and circumstances of a case. **Bowman v. City of Baton Rouge/Parish of East Baton Rouge,** 2002-1376 (La. App. 1st Cir. 5/9/03), 849 So.2d 622, 629, writ denied, 2003-1579 (La. 10/3/03), 855 So.2d 315.

at a parent's request. Instead, the referee has the discretion to respond and react to the parent's request "based on the situation."

Ms. Juneau asserts this case is "comparable" to **Fecke v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College**, 2015-0017 (La. App. 1st Cir. 7/7/15), 180 So.3d 326, writs granted, 2015-1807, 1806 (La. 2/19/16), 186 So.3d 1175, 1177, aff'd in part, rev'd in part, sub nom. **Fecke v. Board of Supervisors of Louisiana State University**, 2015-1806 (La. 9/23/16), 217 So.3d 237, modified on reh'g sub nom. **Fecke v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College**, 2015-1806 (La. 10/19/16), 218 So.3d 1. We disagree. In **Fecke**, an LSU student was injured when she fell from an indoor bouldering wall at the LSU Recreation Center ("UREC"). The jury rendered a verdict in favor of the student and her parents, and the Board of Supervisors appealed. After reviewing the evidence, this court concluded that the Board's employees, UREC staff members, failed to "properly instruct, demonstrate, and certify" the plaintiff understood the proper techniques for climbing the bouldering wall in accordance with their duties set forth in the UREC's manual and safety documents. **Id**. at 346.

Ms. Juneau asserts that, similar to the duty at issue in **Fecke**, the USTA "had a duty to appropriately train its officials to follow appropriate protocols for recognizing and treating heat-related illnesses at tennis tournaments and failed to do so." However, the duty owed and breached in **Fecke** was the duty to train and supervise *users* of the rock wall, and the negligent actors were employees of the Board, thus, making the Board vicariously liable for its employees' failure to train the plaintiff. **Id**. at 343, citing **Ravey v. Rockworks, LLC**, 2012-1305 (La. App. 3d Cir. 4/10/13), 111 So.3d 1187, 1192 (discussing the duty owed by a

11

gym to ensure that its members know how to properly use its equipment). For this reason, we agree with the USTA that **Fecke** is distinguishable.

In **Edwards v. Doug Ruedlinger, Inc.,** 95-0785 (La. App. 4th Cir. 1/31/96), 669 So.2d 541, 543, a student was paralyzed while playing in a high school football game. He and his mother filed suit against the Louisiana High School Athletic Association, Inc. (LHSAA), alleging that "the LHSAA's liability derive[d] from its status as 'the agency that was responsible for managing, coordinating, supervising, promulgating, and setting rules and regulations' for high school interscholastic athletics in the state." **Id**. at 544, quoting the plaintiffs' third amended petition. The plaintiffs argued that the LHSAA was liable for failing to require its members and LHSAA-sanctioned officials to teach and enforce existing rules during LHSAA-sanctioned games. **Id**. The Fourth Circuit disagreed and held that the LHSAA had no duty to control the conduct of those who failed to prevent the player's injury. **Id**. at 545.

The **Edwards** plaintiffs further argued that the LHSAA had a duty to warn parents and participants of the risk of injury in light of the high number of paralyzing injuries among high school football players statewide. **Id**. The evidence established that the LHSAA required student athletes to submit to a physical exam and provide medical information, seemingly to identify a genetic predisposition to sustaining spinal injuries. **Id**. at 543. The court concluded that the LHSAA had no duty to warn, reasoning,

> The evidence shows the LHSAA exists to provide a framework for interscholastic competitions, not to ensure the safety of those individuals who participate in the various sports. Even if the LHSAA has recognized the potential for injury to some students and therefore requires a physical examination for all sports players, the assumption of this limited duty does not encompass a further requirement of specific warnings to football participants. Any duty to warn of such risks is better left to those who instruct and guide the players, not the LHSAA.

**Id**. at 545.

The **Edwards** court relied on **Harvey v. Ouachita Parish School Board**, 20,574, 545 So.2d 1241 (La. App. 2d Cir. 1989), where the Second Circuit concluded that the LHSAA was not liable for the actions of game referees. In **Harvey**, an injured high school football player alleged that LHSAA-approved referees failed to remove overly aggressive players from the game. The plaintiff maintained that the LHSAA controlled the referees, because referees were required to be registered by the LHSAA and pass a rules test given by the LHSAA in order to officiate varsity football games. **Id**. at 1243. The court affirmed dismissal of the LHSAA, noting that the requirement that officials pass a rules test served the LHSAA's purpose of providing a framework for conducting high school athletic contests and promoting sportsmanship in high school athletics. **Id**. at 1245. Much like the USTA, the LHSAA "establishes standards, minimally certifies officials for the individual schools to use, and conducts playoffs leading to the championships." **Id**. at 1243. And, like the ACTA, "the schools themselves conduct the games and hire the officials." **Id**.

We recognize that Ms. Juneau's allegations against the USTA are not identical to those asserted against the LHSAA in **Edwards** and **Harvey**, and the LHSAA, unlike the USTA, did not train officials. Nevertheless, we find these cases provide guidance.[7] As the national governing body for the game of tennis, the USTA's purpose is to "promote and grow the game of tennis." Even if the USTA recognized the risk of heat-related injuries during sanctioned events, we do not find that it had a duty to provide Ms. Jeansonne with the type of training Ms. Juneau alleges or to adopt policies and procedures to address the issue. Any duty to protect against such risks or to warn parents and participants is better left to those who instruct and guide the players, not the USTA. See **Edwards**, 669 So.2d at 545. We cannot say that the USTA owed a duty to Chayse,

---

[7] The parties do not cite jurisprudence directly addressing the liability of a sports organization or association such as the USTA under similar facts, and this court has found none.

considering its only involvement with this tournament was sanctioning the event, which appears to be nothing more than recognizing its legitimacy for purposes of the USTA tournament structure, and certifying that Ms. Jeansonne was qualified to officiate the event in accordance with the USTA's rules of the game.

## CONCLUSION

For the foregoing reasons, the judgment granting the United States Tennis Association's motion for summary judgment is affirmed. Costs of this appeal are assessed against the plaintiff/appellant, Kelly Juneau, individually and on behalf of her minor child, Chayse Juneau.

**AFFIRMED.**